## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNIFER KENNA, derivatively on behalf of AMC ENTERTAINMENT HOLDINGS, INC., | |
| Plaintiff, | Case No.: |
| vs. | |
| ADAM M. ARON, CRAIG R. RAMSEY, CHRIS A. COX, LINCOLN ZHANG, JACK Q. GAO, MAOJUN ZENG, ANTHONY J. SAICH, LLOYD HILL, GARY F. LOCKE, HOWARD W. KOCH, JR., KATHLEEN M. PAWLUS, and DALIAN WANDA GROUP CO. | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| AMC ENTERTAINMENT HOLDINGS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Jennifer Kenna ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant AMC Entertainment Holdings, Inc. ("AMC" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Adam M. Aron, Craig R. Ramsey, Chris A. Cox, Lincoln Zhang, Jack Q. Gao, Maojun Zeng, Anthony J. Saich, Lloyd Hill, Gary F. Locke, Howard W. Koch, Jr., and Kathleen M. Pawlus (collectively, the "Individual Defendants"), Dalian Wanda Group Co. ("Wanda," and together with the Individual Defendants and AMC, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of AMC, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for her complaint

against the Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AMC, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by AMC's directors and officers from December 20, 2016 through the present (the "Relevant Period").

2.      AMC is currently the largest chain of movie theaters in the world, operating in North America and Europe.

3.      Box office admissions constitute the Company's largest source of revenue, followed by food and beverage sales. AMC earns additional income from its loyalty program, AMC Stubs, theater rentals, gift cards, and on-line ticketing fees.

4.      In August 2012, AMC was acquired by Wanda. Wanda holds 100% of the Company's outstanding Class B shares, which have treble the voting power of Class A shares. As a result, Wanda controls approximately 75% of the shareholder voting power over AMC as of the date of filing this Complaint.[1]

---

[1] On September 14, 2018, the Company issued a press release reporting that it had "acquire[d] 24,057,143 AMC Class B common shares held by Wanda," and that, as a result of that transaction, "Wanda now owns 50.01% of AMC

5.      During 2016 and early 2017, AMC acquired several other movie theater chains operating in the United States ("U.S.") and Europe, including:

(a)      U.S. based Carmike Cinemas Inc. ("Carmike"), for $858.2 million;

(b)      Europe based Odeon & UCI Cinemas Holdings Limited ("Odeon") for $637 million; and

(c)      Europe based Nordic Cinema Group Holding AB ("Nordic") for $964 million.

6.      Before acquiring Carmike, Odeon, and Nordic, AMC enjoyed record-breaking financial performance in 2015, which the Company ascribed to strategic growth initiatives that involved reseating a significant portion of its theaters with reclining chairs and enhancing food and beverage options to provide a more luxurious movie-going experience for patrons. As AMC's theaters are generally situated in large urban markets, the Company's growth initiatives had been relatively successful with the Company's customers, who were willing and able to pay more for the enhancements AMC provided. By contrast, Carmike's hometown theaters serviced smaller rural and suburban markets, few of which could sustain the Company's costly initiatives. Hence, when AMC announced its acquisition plans, investors were informed that the Company expected to recognize $35 million in operating synergies annually from, *inter alia*, outfitting a limited portion (15%) of Carmike's theaters over five years with reclining chairs in markets that could support the endeavor, at an expected cost of $50 to $60 million, and overall maintaining Carmike's "lower cost structure at theaters with lower visitation."[2]

---

through its 51,769,784 Class B Common shares." The press release further asserted that even assuming full conversion of all outstanding convertible notes into Class A shares "based on the current conversion price and shares outstanding . . . with the rights of its Class B common shares, Wanda retains voting control of AMC."

[2] In early 2017, the Company announced that it would be rebranding Carmike theaters into the AMC brand, including under AMC's new value-saving "AMC Classic Theatres" brand, which adopted Carmike's "America's Hometown Theatres" tagline.    https://www.thestreet.com/story/14021065/1/amc-theatres-announces-new-branding-for-amc-locations-in-the-united-states.html. Last visited September 26, 2019.

7.      On December 21, 2016, the Company filed a shelf registration statement on Form S-3 with the SEC to permit AMC and its selling stockholders to offer or sell, from time to time, AMC shares in a secondary public offering ("SPO") (the "Registration Statement"). The Registration Statement incorporated a prospectus and later filed prospectus supplements. On February 7 and 9, 2017, AMC filed prospectus supplements with the SEC offering to register 21,904,761 common shares in the SPO for $31.50 per share (the "Prospectus Supplements" and together with the Registration Statement, the "Registration Statements"). The Registration Statements made a number of false and misleading statements and omitted facts necessary to prevent other statements from being misleading.

8.      The Registration Statement inaccurately portrayed Carmike's revenue growth for the first nine months of 2016, despite the fact that Defendant Adam Aron ("Aron") had asserted on December 20, 2016 that AMC had "plenty of time to look at . . . Carmike" and understand and analyze Carmike's operations. Indeed, during the call, Defendant Aron informed investors that between March and December 2016, the Company had gained an understanding of Carmike's operations through its due diligence process and had provided the Department of Justice ("DOJ") with necessary information required for the DOJ's regulatory review. In connection with this due diligence process, Defendant Aron told investors that AMC had obtained a thorough understanding of Carmike's cash flow, customer data, and had identified which Carmike theaters were "capable of supporting an AMC-style renovation."

9.      Further, the Registration Statement, which incorporated by reference various SEC filings, failed to disclose material changes that were having and were foreseeably likely to continue having an adverse impact on Carmike's business at the time of the SPO and on the purported cost synergies AMC expected to achieve soon after the acquisition.

10.     The Registration Statement also made false and misleading statements and omissions regarding the Company's newly acquired international businesses, including omissions regarding seasonality and margins on food and beverage sales.

11.     AMC sold 20,330,874 common shares in the SPO in February 2017, realizing net proceeds of approximately $618 million.  Wanda, by virtue of its controlling ownership in the Company, realized the benefits obtained from the SPO – including the inflated prices obtained for those shares as a result of the misleading statements and omissions detailed herein – in proportion to its controlling interest.

12.     Wanda and the Individual Defendants made and/or caused the Company to make these misstatements and omissions while knowing full well that Carmike had operational issues. In fact, on May 8, 2017, Defendant Aron admitted that Carmike's revenue weakness—which remained undisclosed until that point, was "one of the allures to us of acquiring Carmike."

13.     After markets closed on August 1, 2017, the Company issued a press release announcing disappointing preliminary financial results for the quarter ended June 30, 2017.

14.     On this news, the price per share of AMC stock dropped $5.60, or nearly 27%, from the previous day's closing price to close at $15.20 on August 2, 2017.

15.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

16.     During the Relevant Period, Wanda and the Individual Defendants, in breach of their fiduciary duties owed to AMC, willfully or recklessly made false and misleading statements, and failed to identify and disclose known trends, events, demands, commitments and uncertainties that were then having, and were reasonably likely to continue to have, a material adverse effect on the Company's operating performance. Specifically, Wanda and the Individual Defendants

willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose that: (1) Carmike had been experiencing a prolonged period of financial underperformance largely due to a protracted period of underinvestment in its theaters; (2) following the Carmike acquisition, AMC was able to retain only a very small number of Carmike's loyalty program members; (3) the issues identified in (1)-(2) above were then having a material adverse effect on Carmike's operations and theater attendance and, as a result, AMC planned to boost attendance at Carmike theaters by materially expanding promotional and capital investment spending activity, expenditures which were reasonably likely to have a material adverse effect on AMC's near term operating results; (4) attendance at AMC's European theaters was slower during the summer season than during the rest of the year; (5) representations concerning Carmike's operations, the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and/or misleading; (6) AMC failed to maintain adequate internal controls; and (7) as a result of the foregoing, the Company lacked a reasonable basis for its positive statements about AMC's then-current business and future financial prospects, including statements relating to AMC's financial guidance, and cost synergies associated with the "flawless" Carmike integration.

17.    Wanda and the Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

18.    Additionally, in breach of their fiduciary duties, Wanda and the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

19.     Wanda's and the Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO"), the Company's Chief Financial Officer ("CFO"), the Company's Chief Accounting Officer, a majority of the current members of the Company's Board of Directors (the "Board"), and two former members of its Board to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"),[3] the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants and Wanda who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

20.     On September 23, 2019, the Honorable Judge Allison J. Nathan denied in part and granted in part the motion to dismiss filed by defendants in the Securities Class Action (the "MTD Order").

21.     The Company has been substantially damaged as a result of Wanda's and the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

22.     In light of the breaches of fiduciary duty engaged in by Wanda and the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's current directors, of the substantial likelihood of the current directors' liability in this derivative action and of all of them in the Securities Class Action, and of their not being disinterested or independent directors, a majority of the Board cannot

---

[3] All references to the Securities Class Action refer herein to the Second Amended Complaint filed on November 26, 2018.

consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act of 1933 and the Exchange Act.

24.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

27.    Plaintiff is a current shareholder of AMC. Plaintiff has continuously held AMC common stock at all relevant times.

### Nominal Defendant AMC

28.    AMC is a Delaware corporation with its principal executive offices at One AMC Way, 11500 Ash Street, Leawood, KS 66211. AMC's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "AMC."

**Defendant Dalian Wanda Group Co.**

29.     Defendant Wanda is a multinational conglomerate based in Beijing, China. According to the Company's Schedule 14A filed with the SEC on March 17, 2017 (the "2017 Proxy Statement"), as of February 28, 2017, Defendant Wanda beneficially owned 75,826,927 shares of the Company's Class B common stock, representing approximately 80% of the total voting power as of that date.[4] Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Wanda owned at least approximately $2.38 billion worth of AMC stock.

**Defendant Aron**

30.     Defendant Adam M. Aron ("Aron") has served as the Company's CEO, President and as a Company director since January 2016. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Aron beneficially owned 51,747 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Aron owned over $1.6 million worth of AMC stock.

31.     For the fiscal year ended December 31, 2016, Defendant Aron received $10,932,004 in compensation from the Company. This included $991,200 in salary, a $4.5 million bonus, $4,281,202 in stock awards, $1,144,250 in non-equity incentive plan compensation, and $15,352 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Aron received $7,447,156 in compensation from the Company. This included $1.1 million in salary, $5,605,208 in stock awards, $726,000 in non-equity incentive plan compensation, and $15,948 in all other compensation.

32.     The Company's 2017 Proxy Statement stated the following about Defendant Aron:

---

[4] Wanda holds 100% of the Company's class B shares, and there is no developed market for Class B shares. Class B shares have treble the voting power of Class A shares, and are therefore worth at least as much as Class A shares.

*Mr. Adam Aron, 62,*[5] has served as Chief Executive Officer, President and a director of the Company since January 2016. From February 2015 to December 2015, Mr. Aron was appointed Chief Executive Officer of Starwood Hotels and Resorts Worldwide, Inc. Since 2006, Mr. Aron has served as Chairman and Chief Executive Officer of World Leisure Partners, Inc., a personal consultancy for matters related to travel and tourism, high-end real estate development, and professional sports, that he founded. Mr. Aron served as Chief Executive Officer and Co-Owner of the Philadelphia 76ers from 2011 to 2013, and remains a co-owner currently. From 2006 to 2015, Mr. Aron served as Senior Operating Partner of Apollo Management L.P. Mr. Aron currently serves on the board of directors of Norwegian Cruise Line Holdings, Ltd. and the Philadelphia 76ers. Mr. Aron served on the board of directors of Prestige Cruise Holdings, Inc. from 2007 to 2014. Mr. Aron received a Master's of Business Administration degree with distinction from the Harvard Business School and a bachelor of arts degree cum laude from Harvard College. Mr. Aron brings to the Board significant business and executive leadership experience, including valuable insight into consumer services. He has more than 20 years of experience as a Chief Executive Officer, more than 26 years of experience as a corporate director, and more than 36 years of consumer-engagement experience.

**Defendant Ramsey**

33.     Defendant Craig R. Ramsey ("Ramsey") has served as the Company's CFO since June 2007. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Ramsey beneficially owned 84,418 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Defendant Ramsey owned over $2.6 million worth of AMC stock.

34.     For the fiscal year ended December 31, 2016, Defendant Ramsey received $2,659,220 in compensation from the Company. This included $563,800 in salary, a $700,000 bonus, $962,930 in stock awards, $48,906 in change in pension value and nonqualified deferred compensation earnings, $363,078 in non-equity incentive plan compensation, and $20,506 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Ramsey received $2,347,070 in compensation from the Company. This included $650,000 in salary, $1,399,997 in

---

[5] Emphasis in original unless otherwise noted throughout.

stock awards, $126,217 in change in pension value and nonqualified deferred compensation earnings, $150,150 in non-equity incentive plan compensation, and $20,706 in all other compensation.

35.     The Company's Form 10-K for the fiscal year ended December 31, 2016 filed with the SEC on March 10, 2017 (the "2016 10-K") stated the following about Defendant Ramsey:

> *Mr. Craig R. Ramsey* has served as Executive Vice President and Chief Financial Officer of AMC since April 2002. Mr. Ramsey served as Interim Chief Executive Officer and President of the Company from August 7, 2015 until January 4, 2016. Mr. Ramsey served as Secretary of the Company from April 2002 until April 2003. Mr. Ramsey served as Senior Vice President, Finance, Chief Financial Officer and Chief Accounting Officer from August 1998 until May 2002. Mr. Ramsey served as Vice President, Finance from January 1997 to August 1998, and prior thereto, Mr. Ramsey had served as Director of Information Systems and Director of Financial Reporting since joining AMC in February 1995. Mr. Ramsey has over 30 years of experience in finance in public and private companies. Mr. Ramsey serves on the board of directors for Open Road Releasing. Mr. Ramsey holds a B.S. degree in Accounting and Business Administration from the University of Kansas.

**Defendant Cox**

36.     Defendant Chris A. Cox ("Cox") has served as the Company's Senior Vice President and Chief Accounting Officer since June 2010. As per a Form 4 filed with the SEC on January 3, 2018, Defendant Cox owned 10,284 shares of AMC stock as of that date. Given that the price per share of the Company's common stock at the close of trading on January 3, 2018 was $15.00, Defendant Cox owned over $154,260 worth of AMC stock.

37.     The Company's 2016 10-K stated the following about Defendant Cox:

> *Mr. Chris A. Cox* has served as Senior Vice President and Chief Accounting Officer of AMC since June 2010. Prior thereto Mr. Cox served as Vice President and Chief Accounting Officer since May 2002. Prior to May 2002, Mr. Cox had served as Vice President and Controller since November 2000. Previously, Mr. Cox had served as Director of Corporate Accounting for the Dial Corporation from December 1999 until November 2000. Mr. Cox holds a Bachelor of Business Administration in Accounting and Finance degree from the University of Iowa.

**Defendant Gao**

38.     Defendant Jack Q. Gao ("Gao") served as a Company director from September

2015 until he announced his resignation October 27, 2017.

39.     According to the Company's 2017 Proxy Statement:

In December 2016, Wanda agreed to make a capital contribution of $10,000,000 to
AMC (without any increase in Wanda's economic interest or voting rights in the
Company) for payment to certain officers, directors, and other personnel for
extraordinary services rendered in connection with merger and acquisition activity
in 2016. This contribution was received during February 2017. As a result of these
activities Mr. Jack Q. Gao received a bonus in the amount of $1,500,000 related to
his service as a director.

40.     The Company's 2017 Proxy Statement stated the following about Defendant Gao:

*Mr. Jack Q. Gao, 58*, has served as a director of the Company since
September 2015. Mr. Gao serves as the Group Vice President of Wanda Cultural
Industry Group and the Chief Executive Officer of Wanda Film Holdings Company
and has held such positions since joining Wanda Group in June 2015. Prior to
joining Wanda, Mr. Gao served as Founder of GAO Entertainment, LLC from
January to May 2015. Mr. Gao served as Senior Corporate Vice President for News
Corporation from 2006 to 2014. His roles at News Corporation included serving as
Chief Executive Officer of News Corporation China Investments; Chief Executive
Officer of Star TV China Company; Chairman of MySpace China; and Chief
Representative of News Corporation Beijing Representative Office. Mr. Gao
directed News Corporation strategy, government relations, business development,
strategic investments and Star TV's overall sales, distribution and production
operations in China. Mr. Gao serves on the board of directors of Infront Sports and
Media AG, Beijing Vantone Industrial Co. Ltd., AGTech Holding Ltd. and Mr. Gao
served on the board of directors of AirMedia Group Inc. from 2014 to 2015 and
Bona Film Group Ltd. from 2012 to 2014. Mr. Gao has served as an Adjunct
Professor for the Business School at the Chinese University of Hong Kong. Mr.
Gao graduated from the Harbin Institute of Technology and the University of
California, Los Angeles with a bachelor's degree, masters degree, and a Ph.D.
degree in Engineering. Mr. Gao brings to the board valuable insight into business
strategies and development, many years of experience as a senior executive, and
experience serving on the boards of other companies.

**Defendant Hill**

41.     Defendant Lloyd Hill ("Hill") has served as a Company director since December

2013 and sits on the Audit Committee. According to the 2017 Proxy Statement, as of February 28,

2017, Defendant Hill beneficially owned 13,090 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Hill owned over $410,370 worth of AMC stock.

42.     For the fiscal year ended December 31, 2016, Defendant Hill received $168,704 in compensation from the Company. This included $70,000 in fees paid or earned in cash, and $98,704 in stock awards. For the fiscal year ended December 31, 2017, Defendant Hill received $226,455 in compensation from the Company. This included $150,000 in fees paid or earned in cash, and $76,455 in stock awards.

43.     The Company's 2017 Proxy Statement stated the following about Defendant Hill:

*Mr. Lloyd Hill, 73*, has served as a director of the Company since December 2013. Prior to his retirement in 2006, Mr. Hill served as the Chief Executive Officer and Chairman of Applebee's International, Inc. Mr. Hill serves on the board of directors and as chairman of the compensation committee and member of the audit committee of Red Robin Gourmet Burgers, Inc. and on the board of directors of E.E. Newcomer Enterprises, Inc. Mr. Hill also serves on the board of directors of Saint Luke's South Hospital, the audit committee for the Saint Luke's Health System and the development board for the University of Texas Medical Branch. Mr. Hill holds a master's degree in business administration from Rockhurst University in Kansas City, Missouri. Mr. Hill has extensive experience and knowledge of public company operations, as well as experience serving on the boards of other public companies.

**Defendant Koch**

44.     Defendant Howard W. Koch, Jr. ("Koch") has served as a Company director since October 2014. He also serves on the Nominating and Corporate Governance Committee. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Koch beneficially owned 6,952 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Koch owned over $217,945 worth of AMC stock.

45.     For the fiscal year ended December 31, 2016, Defendant Koch received $158,704 in compensation from the Company. This included $60,000 in fees paid or earned in cash, and $98,704 in stock awards. For the fiscal year ended December 31, 2017, Defendant Koch received $226,265 in compensation from the Company. This included $160,000 in fees paid or earned in cash, and $66,265 in stock awards.

46.     The Company's 2017 Proxy Statement stated the following about Defendant Koch:

*Mr. Howard W. "Hawk" Koch, Jr., 71*, has served as a director of the Company since October 2014. Mr. Koch is a veteran movie producer or principal at The Koch Company, the former president of the Academy of Motion Picture Arts and Sciences ("AMPAS"), and President Emeritus of the Producers Guild of America. Mr. Koch currently serves on the Board of Directors of the Motion Picture & Television Fund and the National Film Preservation Foundation. Mr. Koch previously served on the Board of Governors of AMPAS from 2004 to 2013 and the Board of Directors of the Producers Guild of America from 1999 to 2012. Mr. Koch has been intimately involved with the making of over 60 major motion pictures, among them such films as "Source Code", "Fracture", "Primal Fear", "Marathon Man," "Chinatown," "Wayne's World," "Peggy Sue Got Married," "The Idolmaker," "Heaven Can Wait," "The Way We Were" and "Rosemary's Baby." Mr. Koch continues to develop and produce movies. Mr. Koch has over 51 years of experience in the motion picture industry and provides our Board with a unique insight into the production of movies that are exhibited on our screens.

**Defendant Locke**

47.     Defendant Gary F. Locke ("Locke") has served as a Company director since February 2016. He also serves on the Nominating and Corporate Governance Committee. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Locke beneficially owned 4,302 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Locke owned over $134,860 worth of AMC stock.

48.     For the fiscal year ended December 31, 2016, Defendant Locke received $145,725 in compensation from the Company. This included $48,715 in fees earned or paid in cash, and

$97,010 in stock awards. For the fiscal year ended December 31, 2017, Defendant Locke received

$223,924 in compensation from the Company. This included $68,813 in fees earned or paid in

cash, and $155,111 in stock awards.

49.     The Company's 2017 Proxy Statement stated the following about Defendant

Locke:

> *Mr. Gary F. Locke, 67*, has served as a director of the Company since
> February 2016. Mr. Locke is currently a trade consultant and owner of Locke
> Global Strategies, LLC since 2014. Mr. Locke was the first Chinese American to
> be elected as a U.S. Governor when the voters of Washington elected him in 1996
> and re-elected him in 2000. During his administration he strengthened economic
> ties between China and Washington State. Mr. Locke then served as U.S.
> Commerce Secretary from 2009-2011, where he led the effort to implement
> President Obama's National Export Initiative to double American exports in five
> years. He then became America's 10th Ambassador to China, serving from 2011-
> 2014, and during his service he opened markets for made-in-USA goods and
> services and reduced wait times for visa interviews of Chinese applicants from 100
> days to three days. Mr. Locke is a member of the board of directors of Fortinet, Inc.
> He attended Yale University, graduating with a Bachelor degree in political science
> and received his law degree from Boston University. Mr. Locke brings to the Board
> a global and valuable business perspective due to his extensive role in politics and
> experience as an Ambassador to China.

### Defendant Pawlus

50.     Defendant Kathleen M. Pawlus ("Pawlus") has served as a Company director since

December 2014. She also serves as Chair of the Audit Committee. According to the 2017 Proxy

Statement, as of February 28, 2017, Defendant Pawlus beneficially owned 8,255 shares of the

Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on February 28, 2017 was $31.35, Pawlus owned over $258,790 worth of AMC

stock.

51.     For the fiscal year ended December 31, 2016, Defendant Pawlus received $163,704

in compensation from the Company. This included $65,000 in fees earned or paid in cash, and

$98,704 in stock awards. For the fiscal year ended December 31, 2017, Defendant Pawlus received

$236,265 in compensation from the Company. This included $170,000 in fees earned or paid in cash, and $66,265 in stock awards.

52.     The Company's 2017 Proxy Statement stated the following about Defendant Pawlus:

> *Ms. Kathleen M. Pawlus, 56*, has served as a director of the Company since December 2014. Ms. Pawlus, retired partner of Ernst and Young, LLP ("EY"), served as the Global Assurance Chief Financial Officer and Chief Operating Officer from 2012 to 2014. EY's Assurance practice is the largest of EY's four service lines and includes its Audit Practice, Fraud, Investigation and Dispute Services Practice, Climate Change and Sustainability Services Practice and its Financial Accounting Advisory Services Practice. Prior to this, from 2006 to 2012, Ms. Pawlus served as EY's Americas Chief Financial Officer, Global PBFA Function Leader and US Firm Chief Financial Officer responsible for finance, IT operations, treasury, purchasing and facilities. Ms. Pawlus served on EY's U.S. Executive Board from 2006 to 2012. Ms. Pawlus earned her bachelor of science degree from Indiana University and is a Certified Public Accountant. Ms. Pawlus brings to the Board extensive financial, accounting, operational and management experience in various capacities with more than 30 years of experience.

**Defendant Saich**

53.     Defendant Anthony J. Saich ("Saich") has served as a Company director since August 2012. He also serves as a member of the Audit Committee, and Chair of the Nominating and Corporate Governance Committee. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Saich beneficially owned 4,090 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Saich owned over $128,220 worth of AMC stock.

54.     For the fiscal year ended December 31, 2016, Defendant Saich received $163,704 in compensation from the Company. This included $65,000 in fees earned or paid in cash, and $98,704 in stock awards. For the fiscal year ended December 31, 2017, Defendant Saich received $231,265 in compensation from the Company. This included $165,000 in fees earned or paid in cash, and $66,265 in stock awards.

55.     The Company's 2017 Proxy Statement stated the following about Defendant Saich:

*Mr. Anthony J. Saich*, *63*, has served as a director of the Company since August 2012. Since July, 2008, Mr. Saich has served as the Director of the Ash Center for Democratic Governance and Innovation and Daewoo Professor of International Affairs at Harvard University. In his capacity as Ash Center Director, Mr. Saich also serves as the director of the Rajawali Foundation Institute for Asia and the faculty chair of the China Public Policy Program, the Asia Energy Leaders Program and the Leadership Transformation in Indonesia Program. Mr. Saich also serves as the Chairman of the Board of Trustees of the China Medical Board and International Bridges to Justice and is the U.S. Secretary-General of the China United States Strategic Philanthropy. Mr. Saich sits on the executive committees of the John King Fairbank Center for Chinese Studies and the Asia Center, both at Harvard University, and serves as the Harvard representative of the Kennedy Memorial Trust. Mr. Saich holds a bachelor's degree in politics and geography from the University of Newcastle, United Kingdom, a master's degree in politics with special reference to China from the School of Oriental and African Studies, London University, and has a Ph.D. from the Faculty of Letters, University of Leiden, the Netherlands. Mr. Saich has over 35 years of experience in international affairs and will provide valuable international insights to the Company.

## Defendant Zeng

56.     Defendant Maojun Zeng ("Zeng") has served as a Company director since February 2016 and as non-executive Chairman since March 14, 2018. Defendant Zeng is an employee of Wanda, parent of Wanda American Investment Holding Co. Ltd., which holds 100% of AMC's Class B shares, representing approximately 80% of the total voting power as of the issuance of the 2017 Proxy Statement, and approximately 75% of the total voting power as of September 17, 2018.

57.     The Company's 2017 Proxy Statement stated the following about Defendant Zeng:

*Mr. Maojun (John) Zeng, 45*, has served as a director of the Company since February 2016. Mr. Zeng has been President of Wanda Cinema Line Co., Ltd, a subsidiary of Wanda group since March 27, 2014, and has served as a member of its Board of Directors since July 30, 2013. Mr. Zeng previously served as the Assistant to the President of Wanda Cultural Industries Group and Vice President of Wanda Cinema Line Corporation since February 28, 2012. Mr. Zeng holds an undergraduate degree and a master's degree in business administration from Renmin University of China. Mr. Zeng has experience serving in an executive leadership role at a major theatrical exhibition company in China and brings to the Board valuable theatrical exhibition knowledge.

**Defendant Zhang**

58.     Defendant Lincoln Zhang ("Zhang") served as a Company director and Chairman of the Board from August 2012 to March 12, 2018, upon which date he resigned. Defendant Zhang is an employee of Wanda, parent of Wanda American Investment Holding Co. Ltd., which holds 100% of AMC's Class B shares, representing approximately 80% of the total voting power as of the issuance of the 2017 Proxy Statement, and approximately 75% of the total voting power as of September 17, 2018.

59.     The Company's 2017 Proxy Statement stated the following about Defendant Zhang:

> *Mr. Lin (Lincoln) Zhang, 44*, has served as Chairman and a director of the Company since August 2012. Mr. Zhang has served as President of Wanda Cultural Industry Group since 2012. Mr. Zhang has served on the board of directors of Wanda Cinemaline Corporation since November 2006, Dalian Wanda Commercial Properties Co., Limited since December 2009, and Dalian Wanda Group Co., Limited since February 2011. Mr. Zhang also currently serves on the board of directors of Infront Sports & Media AG, Atletico De Madrid, and World Triathlon Corporation since 2015. Prior thereto, Mr. Zhang served as Vice President of Dalian Wanda Group Co., Limited from December 2009 to December 2012. Mr. Zhang received an M.B.A. from Beijing University and a bachelor's degree in accounting from Dongbei University of Finance and Economics. Mr. Zhang is a non-practicing member of the Chinese Institute of Certified Public Accountants and a non-practicing member of the China Certified Tax Agents Association. Mr. Zhang has over 16 years of experience in financial management and operation management of large companies, especially in corporate strategy and investment, which makes him well-positioned to serve as a director for the Company.

**FIDUCIARY DUTIES OF WANDA AND THE INDIVIDUAL DEFENDANTS**

60.     By reason of their positions as controlling shareholder, officers and/or directors of AMC, and because of their ability to control the business and corporate affairs of AMC, Wanda and the Individual Defendants owed AMC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AMC in a fair, just, honest, and equitable manner. Wanda and the Individual

Defendants were and are required to act in furtherance of the best interests of AMC and its shareholders so as to benefit all shareholders equally.

61.     Each controlling shareholder, director and officer of the Company owes to AMC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     Wanda and the Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of AMC, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the controlling shareholder, officers and directors of AMC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Wanda and each Individual Defendant, by virtue of its, his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Wanda and the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AMC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that Wanda and the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by

the remaining Individual Defendants who collectively comprised AMC's Board at all relevant times.

65.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants – along with Wanda, as controlling shareholder – had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

66.     To discharge their duties, the officers and directors of AMC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AMC were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Kansas, and the United States, and pursuant to AMC's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how AMC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of AMC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AMC's operations would comply with all applicable laws and AMC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.      Wanda and each of the Individual Defendants further owed to AMC and the shareholders the duty of loyalty requiring that each favor AMC's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AMC and were at all times acting within the course and scope of such agency.

69.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with AMC, each of the Individual Defendants and Wanda had access to adverse, non-public information about the Company.

70.     Wanda and the Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AMC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.     In committing the wrongful acts alleged herein, Wanda and the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. Wanda and the Individual Defendants caused the Company to conceal the true facts as alleged herein. Wanda and the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise Wanda's and the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

73.     Wanda and the Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Wanda and the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AMC was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

74.     Wanda and each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, Wanda and each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AMC and Wanda, and was at all times acting within the course and scope of such agency.

## AMC'S CODE OF ETHICS

76.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the Code "is applicable to all of our directors, officers, including designated officers, and other associates . . . and provides a general statement of our expectations regarding ethical standards to which such persons are expected to adhere."

77.     The Code of Ethics provides, as to "Accurate and Timely Periodic Reports," that:

[W]e expect our designated officers and others responsible for such matters to conduct themselves in such a way that we will:

- comply with generally accepted accounting principles at all times;
- maintain a system of internal accounting controls that will provide reasonable assurances to management that all transactions are properly recorded;
- maintain books and records that accurately and fairly reflect our transactions;

                                        * * *

- maintain a system of disclosure controls and procedures that will provide reasonable assurances to management that material information about us is made known to management, particularly during the periods in which our periodic reports are being prepared; and
- present information in our periodic reports and other public communications in a full, fair, accurate, timely, clear and understandable manner.

78.    The Code of Ethics provides, as to "Internal Financial Controls and Reports," that:

Accounting control standards and procedures exist to ensure that our assets are protected and properly used and our financial reports and records are accurate and reliable. The accuracy of these reports depends upon the accuracy of the information provided. All documents supporting the financial records should be accurate and should reflect the true nature of the transaction. You should not falsify or otherwise provide information that is not accurate or complete in connection with any Company form or record.

79.    The Code of Ethics provides, as to "Public Communications," that "[w]e are committed to providing full, fair and accurate disclosure in all public communications and in compliance with all applicable law, regulations and rules."

80.    The Code of Ethics provides, as to "Reporting Concerns," that:

Any known or suspected violation of this Code of Ethics should be reported promptly to your supervisor, the Company's Compliance Director or the Company's General Counsel. In this regard, failure to report any violation and impeding an investigation will be deemed a violation of this Code of Ethics.

81.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' and Wanda's violations of law, including breaches of fiduciary duty, unjust

enrichment, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## WANDA'S AND THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

82.     Following the recent acquisitions of several other theater chains in the U.S. and Europe, AMC owns and operates the world's largest chain of movie theaters.

83.     In addition to traditional film programming, AMC offers customers a range of entertainment experiences. AMC offerings include independent and foreign films, music, sports, and performing arts, as well as food and beverage options ranging from snacks and sodas to alcohol and dine-in options.

84.     Box office admissions constitute the Company's largest source of revenue, followed by food and beverage sales. AMC earns additional income from its loyalty program, AMC Stubs, theater rentals, gift cards, on-screen advertising, and on-line ticketing fees.

85.     AMC Stubs provides numerous benefits to members, including discounts and members-only offerings and services. AMC had 5.2 million active member households enrolled in Stubs as of December 31, 2016. The Company's 2016 10-K stated that the Stubs program is designed to strengthen guest loyalty, attract new guests, and drive return visits.

86.     The Company opened its first all-recliner seating theater in 2009 and by 2011 launched a strategic initiative to reseat its existing theaters with electric recliners at an estimated cost of $450,000 per screen.

87.    The Company's initiatives included additional transformations to AMC's existing theaters that would enhance the movie-going experience for AMC patrons. This included expanding food and beverage options to include, *inter alia*, dine-in meals and alcoholic beverages.

88.    Although AMC's enhancement project increased ticket prices for customers, the reseating program and transformation initiatives were well-received by AMC patrons, thus providing the Company with significant financial returns. In some instances, AMC recognized 100% cash-on-cash returns to the Company in just one year.



89.    Given the geographic locations of most of AMC's theaters at the time, which were generally situated in larger urban/metropolitan areas, the response by AMC patrons to the Company's more costly, yet luxurious enhancements, was unsurprising. In fact, as noted by one of the largest securities firm in the U.S., Wedbush Securities, the Company's "exposure to larger [designated market areas] allow for opportunities to increase competitive positioning through these

[6] https://celluloidjunkie.com/2015/02/24/amcs-luxury-reseating-plans-revealed/. Last visited September 27, 2019.

initiatives that may not make as much strategic sense for other exhibitors to focus on[]" i.e. smaller geographic areas.[7]

90.     In August 2012, Chinese conglomerate, Wanda, acquired AMC. According to AMC's website, Wanda's acquisition "enable[d] funding to ensure a massive escalation of AMC's world-class amenities, including recliner seating, better sight & sound presentation and MacGuffins bars." In May 2012, *The Wall Street Journal* reported that the "deal would create one of the world's largest cinema owners and mark the largest acquisition of a U.S. corporation by a Chinese buyer on record."[8] Wanda's acquisition of AMC was valued at around $2.6 billion. Wanda's Chairman and President, Wang Jianlin, stated that the acquisition would "help make Wanda a truly global cinema owner, with theater and technology that enhance the movie-going experience for audiences in the world's two largest movie markets."[9] The acquisition allowed Wanda access to AMC's 346 multiplex theaters, equipped with over 5,000 screens located primarily in North America. In a press release issued by AMC on September 4, 2012, the Company announced that Wanda would invest "up to an additional US$500 million . . . to fund strategic and operating initiatives."[10] Additionally, Wanda's investments would enable the Company to "update its cinemas' technical innovations and reduce debt."[11]

---

[7]  https://www.benzinga.com/analyst-ratings/analyst-color/15/02/5250664/wedbush-securities-reiterates-outperform-raises-price-ta. Last visited September 27, 2019.
[8] https://www.wsj.com/articles/SB10001424052702304791704577418620927795172. Last visited September 27, 2019.
[9] https://www.wsj.com/articles/SB10001424052702303610504577417073912636152. Last visited September 27, 2019.
[10] http://investor.amctheatres.com/Cache/1001181459.PDF?O=PDF&T=&Y=&D=&FID=1001181459&iid=417129. Last visited September 27, 2019.
[11] https://www.wsj.com/articles/SB10001424052702303610504577417073912636152. Last visited September 27, 2019. Last visited September 27, 2019.

91.     In December 2013, AMC went public. The Company priced its shares at $18 per share in the initial public offering ("IPO"). After the IPO, Wanda retained an 80% stake and full control over the Company. Wanda continues to control AMC today.

92.     Acquiring AMC was only part of Wanda's global expansion strategy. A few years after purchasing AMC, Wanda purchased Hoyts Cinema, an Australian movie chain for $366 million in 2015, and Hollywood film production studio, Legendary Entertainment, for $3.5 billion in 2016.[12] By July 2016, Wanda's deals exceeded $28 billion.[13]

*Acquisitions*

**Carmike Acquisition**

93.     In 2016 and early 2017, AMC acquired several other theater chains in the U.S. and Europe.

94.     Defendant Aron took on his role as CEO of the Company on January 4, 2016. From the beginning of his tenure, he initiated a purported growth plan for the Company that involved acquisitions. Indeed, the same month Defendant Aron assumed the position of CEO of AMC, the Company expressed an interest in acquiring Carmike. In an interview, Defendant Aron noted that he "called the CEO of Carmike on my first week of the job . . . . We had dinner on the third week. There was no reason to go slow. There is an old adage, 'Time is the enemy of all deals.'" (internal quotations removed). Defendant Aron also noted that Wanda had "greenlighted his plan" to grow AMC through executing an acquisition strategy and was "enthusiastic" about the potential acquisition of Carmike. The acquisition of Carmike would inevitably help Wanda achieve its goal "of controlling 20% of the global film market by 2020."[14] Notably, when the Company completed

---

[12]   https://www.scmp.com/business/companies/article/2134152/has-wanda-made-legendary-mistake-its-acquisition-hollywood-studio. Last visited September 27, 2019.

[13] https://variety.com/2016/biz/asia/wanda-30-billion-of-deals-1201814189/. Last visited September 27, 2019.

[14]   https://adage.com/article/media/amc-entertainment-buys-carmike-creating-largest-theater-chain/302955.    Last visited September 27, 2019.

its acquisition of Carmike, AMC, and therefore, Wanda, became the "largest exhibitor in the U.S., Europe, and the world."[15]

95.     Carmike provided due diligence materials to AMC in January 2016, including Carmike's February 2015 financial projections. Carmike's February 2015 projections proved to be overly optimistic, as was revealed when Carmike announced its 2015 financial results, which missed its 2015 internal revenue projections by 10% and its EBITDA estimates by 17%.

96.     AMC filed a Form S-4 on September 9, 2016 that stated as follows:

On January 20, 2016, Mr. Aron and other members of AMC's senior management met with Mr. Passman and other members of Carmike's senior management. At the meeting, AMC's senior management discussed with Carmike's senior management AMC's potential timeline and diligence process to complete a transaction and other issues regarding a potential transaction. Also at the meeting, AMC's senior management suggested a transaction in which AMC would acquire Carmike for a purchase price of $26.00 per share, which consideration would be payable in cash and shares of AMC Class A common stock. Carmike's senior management noted that the parties had previously discussed in the first quarter of 2015 a price of $37.00 per share. Following discussion, AMC's senior management stated that they would give consideration to increasing AMC's proposed purchase price to a number in the range of $26.00 to $30.00 per share. Carmike's senior management did not agree to any transaction terms at the meeting and informed AMC's senior management that they would discuss with Carmike's Board any specific proposal from AMC to acquire Carmike. AMC's senior management informed Carmike's senior management that AMC expected to send Carmike a preliminary proposal regarding a transaction once AMC had received additional diligence information (including diligence material regarding the results of operations of Carmike's fourth quarter of fiscal 2015).

On January 25, 2016, the Carmike Board's Executive Committee met to discuss the meeting with AMC's senior management that took place on January 20, 2016. At the meeting, the Carmike Board's Executive Committee authorized Carmike's senior management to enter into an extension to Carmike's confidentiality agreement with AMC and to provide AMC with additional diligence material. Also at the meeting, the Carmike Board's Executive Committee agreed to schedule a board meeting to further discuss a potential transaction with AMC.

---

[15]     https://www.hollywoodreporter.com/news/amc-theatres-closes-carmike-cinemas-acquisition-become-largest-us-exhibitor-958228. Last visited September 27, 2019.

On January 26, 2016, Carmike entered into an extension to its confidentiality agreement with AMC, and Carmike thereafter provided AMC with additional diligence material.

97.     AMC and Carmike announced on March 3, 2016 that the firms had entered into a definitive merger agreement. The agreement established that AMC would acquire all outstanding shares of Carmike for $30.00 per share, cash. This deal valued Carmike at approximately $1.1 billion. AMC agreed to enter into a debt financing commitment letter to fund the acquisition.

98.     The day after the joint announcement, the Company held a conference with analysts and investors to discuss the Carmike acquisition. On the call, Defendant Aron touted that Carmike and AMC were complimentary companies, servicing different spectrums of geographic markets. Defendant also attributed the record-breaking financial results AMC experienced in 2015 to its growth initiatives, which included reseating its theaters with electronic reclining chairs and expanding food and beverage options at its theaters. As noted above, these growth initiatives were a success with the Company's customers, and allowed AMC to benefit from increased attendance rates, in spite of higher patron costs and reduced capacity. Specifically, in 2015, the Company recorded a 60% increase in attendance at its theaters that had been reseated with reclining chairs and redesigned to include other enhancements. Unlike AMC, Carmike operated hometown style theaters in rural and suburban areas and generally served less affluent patrons.  As such, Defendant Aron expressed to investors during the March 2016 conference call that AMC planned on reseating approximately 428, or around 15% of Carmike's theaters in markets where it was financially prudent over a five-year period for an estimated aggregate cost of $50-$60 million.

99.     AMC issued a press release on July 25, 2016 announcing it had entered into an amended and restated merger agreement with Carmike, under which AMC would acquire all outstanding Carmike shares at $33.06 per share in cash and stock, and would assume all of

Carmike's net debt. The press release stated that "[t]he revised offer was approved by both Boards of Directors of AMC and Carmike, respectively." The agreement was subject to, *inter alia*, regulatory approval and the SEC declaring effective a Form S-4 registration statement with respect to additional AMC common stock to be issued in connection with the merger.

100.    According to confidential witnesses interviewed in connection with the Securities Class Action ("CW-1" and "CW-2"), AMC originally considered acquiring Carmike in 2014, but abandoned that effort after AMC discovered issues resulting from an extended period of underinvestment that caused significant infrastructure problems at Carmike. The Court held in the MTD Order that CW-1 and CW-2 "as to Carmike's underinvestment . . . lend further support to an inference of scienter." The MTD Order stated in relevant part, "[a]s an initial matter, Plaintiffs have 'described [these witnesses] in the complaint with sufficient particularity to support to the probability that a person in the position occupied by the source would possess the information alleged.'"[16] Specifically, "CW-1 was a systems administrator at AMC up through December 2017, which makes it probably that they would know about Carmike's information technology infrastructure."[17] As described in the Securities Class Action, CW-1 maintained that AMC employees were scheduled to conduct a detailed review of Carmike's information technology ("IT") infrastructure at Carmike's headquarters in Atlanta, Georgia. However, the review never occurred because the Company's management concluded Carmike was a "lemon." CW-1 further corroborated the prolonged period of underinvestment Carmike suffered from and stated that to save money, Carmike had been outsourcing its IT infrastructure needs. As a result, Carmike required "major renovations" to its IT infrastructure, and Carmike's theaters required updated equipment. CW-1 stated that handling Carmike's outdated theaters was a constant struggle for the

---

[16] MTD Order at 37.
[17] MTD Order at 37.

Company due to the difficulty of integrating and accommodating Carmike's equipment and networks, a process which necessitated a "paradigm shift." This integration process, according to CW-1 lasted from at least the close of the acquisition until the end of December 2017, when CW-1 left their position.

101.   A Schedule 14A filed by Carmike on October 10, 2016 (the "Carmike Merger Proxy") confirmed that AMC initially proposed to acquire Carmike in May 2014. The Carmike Merger Proxy explained that AMC engaged in due diligence from October 2014 through the first fiscal quarter for 2015. Ultimately, AMC notified Carmike on April 10, 2015 that it was no longer interested in pursuing the merger, informing Carmike that "over time its ***management and board*** grew increasingly less comfortable with the terms of the transaction."[18]

102.   CW-2—a former Carmike district manager—confirmed that Carmike's theaters were in disrepair due to management's unwillingness to invest in upkeep, that Carmike had engaged in renovations at an extremely slow pace for three to four years leading up to the announcement that AMC would acquire Carmike, and that the pace of renovations at Carmike was unchanged following the announcement of the acquisition. The MTD Order held that CW-2 was "one of twelve Carmike district managers, which makes it probable that they would have information about the state of Carmike's theaters."[19] According to CW-2, around 70% of the theaters CW-2 managed were in a state of "disrepair" and that crucial repairs and renovations were not approved by Carmike's corporate offices. To illustrate, CW-2 noted that it took years to acquire corporate approval to repair a broken HVAC system on the roof of one of the theaters CW-2 managed. CW-2 described Carmike's theaters as a "consciously neglected" chain which would cost a "huge" amount to update.

---

[18] Emphasis added.
[19] MTD Order at 36.

103.     CW-2 asserted that Carmike kept detailed records of the financial performance of each theater, that it was common knowledge during AMC's months-long due diligence process that Carmike was experiencing significant revenue weaknesses, and that AMC had unfettered access to Carmike's operational and financial data (including monthly and real-time data) during the due diligence process. In fact, by the summer of 2016, CW-2 maintained that Carmike executives were instructed to allow AMC access to "whatever they wanted[.]" CW-2 stated that Carmike's state of underperformance was common knowledge among Carmike employees and executives  during AMC's due diligence, and believed that David Passman, Carmike's former CEO had indicated that if the AMC acquisition had not been finalized, Carmike would have gone bankrupt within six months.

104.     The MTD Order held that CW-1 and CW-2's testimony provided support for the inference that information surrounding Carmike's infrastructure issues would have been communicated to the Company's senior executives. Specifically, the MTD Order held in relevant part:

> Plaintiffs also sufficiently allege that CW-1 and CW-2 were aware of 'what information was communicated to senior executives.' CW-2 alleges that AMC had effectively unfettered access to Carmike's data for months during the due diligence process. While this on its own might not support an inference of knowledge, it does so in light of Aron's statements about the level of due diligence performed, specifically the evaluation of dozens of theaters for renovations. Similarly, CW-1 alleges that AMC's executive leadership was already aware of issues with Carmike's infrastructure as far back as 2014, when AMC had previously considered acquiring Carmike. It is a reasonable inference that this information would have been passed on or at least been made available to AMC's executives when they decided to acquire Carmike in 2016 and considered during the due diligence process. Finally, CW-2 and CW-1's testimony about the extent of underinvestment offers some further support to this inference that this information would have been passed along to senior executives. The allegations regarding CW-1 and CW-2 thus provide some further support for an inference of scienter as to Carmike's underinvestment.[20]

---

[20] MTD Order at 38 (internal citations removed).

105.     On October 11, 2016, the SEC declared AMC's Form S-4 registration statement related to the common stock to be issued in connection with the Carmike merger to be effective.

106.     AMC issued a press release on December 20, 2016, announcing that the DOJ had concluded its antitrust review of the acquisition and approved the merger with Carmike.

107.     On December 20, 2016, prior to the SPO discussed further herein, AMC held a conference call with analysts and investors to discuss the Company's acquisition of Carmike (the "Carmike Conference Call"). On the Carmike Conference Call, Defendant Aron told investors that, by December 20, 2016, AMC had had "plenty of time to look at . . . Carmike" and understand and analyze its operations, including, *inter alia*, the customer visitation-related data associated with the Carmike theaters.

108.     The Carmike acquisition was completed on December 21, 2016 for $858.2 million, comprised of $584.3 million in cash and $273.9 million in common stock. AMC also assumed $230 million of Carmike's debt as part of the merger.

109.     As of December 21, 2016, Carmike operated 271 theaters across 41 U.S. states, with a total of 2,923 screens. According to AMC's SEC filings, Carmike is a nation-wide leader in digital cinema, 3-D cinema, and alternative programming.

110.     In order to obtain regulatory approval for the merger, AMC agreed with the DOJ to, *inter alia*, divest ownership of AMC theaters in 15 local markets where AMC and Carmike's business overlapped, divest its majority interest in National Cinemedia LLC, and transfer 24 theaters to the Screenvision LLC network.

**Odeon and Nordic Acquisitions**

111.     AMC completed the acquisition of all outstanding equity of Odeon on November 30, 2016. As reported in a press release issued by AMC on July 12, 2016, the Odeon acquisition

was "approved by both the Board of Directors of AMC and the shareholder of Odeon & UCI." As of the acquisition date, Odeon operated 242 theaters in Western Europe.[21]

112.    According to a confidential witness interviewed in connection with the Securities Class Action, AMC began receiving financial information from Odeon in September 2016, which was mapped onto AMC's financial management system no later than December 31, 2016. The confidential witness asserted that the financial information received from Odeon was sufficiently detailed for AMC to understand monthly and seasonal trends in Odeon's business.

113.    The Odeon acquisition cost AMC $637 million, $480.3 million of which was cash and $156.7 million of which was paid in stock. AMC also paid $593.2 million of Odeon's outstanding debt. AMC borrowed $500 million to finance the Odeon acquisition.

114.    Following the consummation of the Odeon acquisition, AMC began operating its business in two reportable segments: U.S. markets and International markets.

115.    AMC announced an agreement to acquire Nordic in an all cash transaction valued at $964 million on January 23, 2017. That press release revealed that the merger "already has been approved by both the Board of Directors of AMC and Nordic's ownership group." Prior to the acquisition, Stockholm-based Nordic was the largest theater exhibitor in seven nations across Scandinavia and the Nordic and Baltic regions.

116.    Unlike the domestic movie market, which tends to see higher attendance in the summer months, European theaters tend to see lower attendance during summer months.

117.    In order to finance these acquisitions, AMC took on various forms of debt. For the Carmike transaction, AMC entered into a bridge loan agreement for $350 million with affiliates of Barclays, Citigroup, Credit Suisse, Merrill Lynch, and HSBC Securities (USA) Inc. Each of

---

[21] Specifically, Odeon operated theaters in the U.K., Spain, Germany, Italy, Austria, Portugal and Ireland.

these lenders were underwriters in the Company's SPO, and the agreements required more than

$30 million of proceeds from the SPO to be used to pay down the bridge loan.

118.    Between September 30, 2016 and December 31, 2016, AMC's debt load grew from

$3.4 billion to $6.6 billion, due in part to the acquisitions described above.

119.    On March 10, 2017, the Company issued a press release announcing that:

> it intends to offer, subject to market and other conditions, $475 million in aggregate principal amount of dollar-denominated senior subordinated notes due 2027 . . . and an additional £250 million aggregate principal amount of sterling-denominated 6.375% Senior Subordinated Notes due 2024 . . . in a private offering that is exempt from the registration requirements of the Securities Act . . . .

The press release noted that the Company intended to use the proceedings of the offering to finance

the Nordic acquisition, "pay related fees and expenses and to use any remaining proceeds for

general corporate purposes."

120.    By the end of 2017, AMC owned, operated, or held interests in 649 theaters in the

U.S. and 365 theaters in Europe.

### *Chinese Regulatory Clamp Down on Wanda's Financing*

121.    In 2016, upon information and belief, the Chinese government began enforcing

certain restrictions on Wanda that prevented Wanda from obtaining funds from financial

institutions in China for a number of its foreign transactions, including AMC's planned

acquisitions of Carmike and Nordic. The Chinese government clamp down on Wanda and other

companies targeted rising debt levels of certain successful conglomerates in an effort to address

economic concerns related to corporate indebtedness.[22] According to a "mysterious document"

circulated on the internet around July 17, 2017, the Agricultural Bank of China was barred from

lending Wanda money for Wanda's overseas acquisitions.[23] Wanda's acquisition of Legendary

---

[22] https://cn.nytimes.com/business/20170719/amc-wanda-china-debt/en-us/. Last visited September 27, 2019.
[23] https://cn.nytimes.com/business/20170719/amc-wanda-china-debt/en-us/. Last visited September 27, 2019.

Entertainment in 2016 particularly incited public scrutiny from Chinese regulators, who opined that Wanda had overpaid significantly for the acquisition and forced Wanda to withdraw its attempt to go public on the Chinese stock market.[24] The next day, on July 18, 2017, AMC issued a press release denying reports that it received funding from Wanda for any of its recent acquisitions, including Carmike, Odeon, and Nordic.[25]

### *The SPO*

122.    On December 21, 2016, the Company filed the Registration Statement with the SEC on Form S-3. The purpose of this filing was to permit AMC and its selling stockholders to offer or sell, from time to time, AMC shares in a secondary public offering.

123.    On February 7 and 9, 2017, AMC filed the Prospectus Supplements with the SEC. The Prospectus Supplements offered to register 21,904,761 common shares[26] in the SPO for $31.50 per share.

124.    AMC sold 20,330,874 common shares in the SPO, realizing net proceeds of approximately $618 million.

### *Registration Statement Requirements*

125.    Instruction 11(a) of Form S-3 requires an issuer to disclose "***any and all material changes in the registrant's affairs*** which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to security holders and which have not been described in a report on Form 10-Q . . . or Form 8-K . . . filed under the Exchange Act."[27]

---

[24]   https://www.forbes.com/sites/robcain/2017/07/24/wanda-billionaire-wang-jianlin-learns-whos-boss-as-president-xi-blesses-ma-crackdown/#1cf614c46b1a. Last visited September 27, 2019.

[25] http://investor.amctheatres.com/file/Index?KeyFile=389497765. Last visited September 30, 2019.

[26] This figure included 2,857,142 shares pursuant to an overallotment option issued to the underwriters.

[27] Emphasis added.

126.    Regulation S-K requires, as noted in the instructions to Item 303(a), that the registration statement disclose and "focus specifically" on material events and uncertainties that would cause the historical financial information about the Company not to be necessarily indicative of future operating results. This includes "matters that would have an impact on future operations and [matters that] have not had an impact in the past." The instructions state, in relevant part:

> The discussion and analysis shall ***focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results*** or of future financial condition. ***This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past***, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.[28]

127.    The SEC issued an interpretive release to Item 303 of Regulation S-K on May 18, 1989 (the "1989 Interpretive Release"). The 1989 Interpretive Release clarifies that there is a duty to disclose where a demand, trend, commitment, uncertainty or event is both presently known to management and reasonably likely to have a material effect on either the registrant's financial condition or results of operation. The 1989 Interpretive release states, in relevant part:

> Item 303(a)(2)(i) requires a description of the registrant's material "commitments" for capital expenditures as of the end of the latest fiscal period. However, even where no legal commitments, contractual or otherwise, have been made, ***disclosure is required if material planned capital expenditures result from a known demand, as where the expenditures are necessary to a continuation of the registrant's current growth trend***. Similarly, if the same registrant determines not to incur such expenditures, a known uncertainty would exist regarding continuation of the current growth trend. If the adverse effect on the registrant from discontinuation of the growth trend is reasonably likely to be material, disclosure is required. ***Disclosure of planned material expenditures is also required, for example, when such expenditures are necessary to support a new, publicly announced product or line of business***.
>
> * * *
>
> Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government

---

[28] Emphasis added.

contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. ***More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant***, or may have been advised by the government that the contract may not be renewed. ***The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required***.[29]

128.   On December 19, 2003, the SEC issued an interpretive release to Item 303 of Regulation S-K, with an effective date of December 29, 2003 (the "2003 Interpretive Release"). The 2003 Interpretive Release established that the Registration Statement was required to disclose known demands, events, or uncertainties, except for those that management determined: (1) were not reasonably likely to occur; or (2) would not have a material effect on the Company's operating results. The 2003 Interpretive Release states, in pertinent part;

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.[30]

129.   Item 101(c)(1)(v) of Regulation S-K, 17 C.F.R. § 229.101(c)(1)(v), requires that the Registration Statement disclose the seasonal nature of each of the Company's business segments.

***Proxy Statement Requirements***

130.   Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, requires that a proxy statement disclose "any known trends or uncertainties that have had or that the registrant

---

[29] *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Release Nos. 33-6835 and 34-26831, 1989 SEC LEXIS 1011, at *15, *18 (May 18, 1989) (Emphasis added, footnote omitted).
[30] *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350 and 34-48960, 2003 SEC LEXIS 3034, at *36 (Dec. 19, 2003) (footnote omitted).

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

**False and Misleading Statements**

*Carmike Press Release & Conference Call*

131.    On December 20, 2016, the Company issued a press release that announced that regulatory approval had been obtained for the Carmike acquisition (the "Carmike Press Release"). AMC also held a related conference call (the "Carmike Conference Call") with analysts and investors later that same day to discuss the Carmike acquisition.

132.    Defendant Aron began the Carmike Conference Call by discussing the benefits of the Carmike acquisition, announcing that, in addition to expanding AMC's geographic footprint:

> *it will allow us to introduce our successful guest experience initiatives proven at AMC to tens of millions of new customers* improving the movie-going experience for them. *It's also expected to broaden our appeal at moviegoers with more people having access to the AMC Stubs loyalty program* redesigned in July and our new website, www.amctheaters.com, and smartphone apps launched just three weeks ago. . . . [i]n total, *we are as confident today as we were back in March [2016] when this transaction was first announced, that the growth potential for AMC is enhanced by joining forces with Carmike Cinemas*.[31]

133.    Defendant Aron assured investors that AMC had become thoroughly familiar with the operations of both Carmike and Odeon, stating:

> On November 30, we completed the acquisition of Odeon [and] UCI Cinemas Group, since renamed Odeon, and our teams have already been on the ground since day one in Europe working with our colleagues at Odeon to integrate the UK and Europe's largest movie exhibition circuit into the growing world of AMC.

134.    On the Carmike Conference Call, Defendant Aron told investors that, by December 20, 2016, AMC had had "plenty of time to look at . . . Carmike" and understand and analyze its

---

[31] Emphasis added.

operations, including, among other things, the customer visitation-related data associated with the

Carmike theaters. During the call, the following exchange took place:

> [Eric Handler, Analyst, MKM Partners:] Thanks for taking my question. Two questions for you guys. ***First, with regards to Carmike, now you've had quite a bit of time to go through the Company's books and access their assets***. I'm just curious how fast do you think you can move in terms of doing some renovations and reseats at the circuit and ***what have you found from kicking the tires on the assets over the past, what's nearly a year now***? . . .

> [Defendant Aron:] Eric. I will take two of your three and Craig will take the third. In terms of what we've learned over the year, the blessing of – we announced the transaction in March. It's now December. ***So, we've had plenty of time to look at the Carmike circuit and to plan for the integration*** . . .

> In terms of what we've learned, ***we've learned that***, for all of our talk, including in my prepared remarks about – ***[AMC is] in big markets and [Carmike is] in small markets*** and actually there is a big chunk of theaters that overlap and so what we've decided to do is proceed with what we are calling a two-brand strategy, three brands if you count the dine-in theaters as its own sub-brand. ***You have some theaters that will be branded and taken to the public as AMC and other theaters that have less visitation that might have slightly lower service standards, branded*** as a second brand, but what we found is that there are plenty of Carmike theaters that are substantial enough in their visitation or locales to graduate, so to speak, into the AMC brand. And there are a lot of AMC theaters that also have lower visitation levels that we think are more like a Carmike theater than like an AMC theater.

135.    Notably, Defendant Aron stated that through its due diligence, AMC identified

"plenty of Carmike theaters that are substantial enough in their visitation or locales to graduate, so

to speak, into the AMC brand." Defendant Aron continued on the call, maintaining that 50 to 100

Carmike theaters could support an AMC-style renovation, stating in relevant part:

> ***So, I would expect*** that in excess of 50 current AMC theaters will move into the second brand and ***in excess of 100 [of the 271] Carmike theaters will move into the AMC brand***. Now, just because they are different brands doesn't mean that guest satisfaction will be lower in brand 2 than brand 1. It just means that we will offer different levels of service, amenities and price points and better marry consumer expectations to the reality of what's being offered.

> So, I think that's what we've learned . . . .[32]

---

[32] Emphasis added.

136.    Defendant Aron also noted that "being maniacal about cost management is extremely important. And for that reason, again, we're pleased by the two-brand strategy because we'll have one set of operating standards for AMC theatres, another set of operating standards for the second brand theatres, and that will allow us to be more focused on managing costs at each brand at the appropriate level."

137.    With respect to theater renovation and attendance, Defendant Aron stated:

> *We do think the fact that we're going to commit to renovate a significant number of AMC theaters and a significant number of Carmike theaters and a significant number of Odeon theaters* is going to cause attendance at those theaters to increase. That's good for studios, that's good for us.

* * *

> We are in the business, as all companies are, [of] rationally deploying and allocating capital and we will put our monies where we get the best returns as best we can figure out what they'll be. There is opportunity for investment at the AMC circuit. There's opportunity for investment at the Carmike circuit and there's opportunity for investment at the Odeon circuit. I expect that you will see us make improvements at each of the three circuits, although as I said on the margin, we ration capital where it produces the highest return. And so, we look at these projects one at a time, theater by theater.[33]

138.    Concerning the loyalty program, Defendant Aron stated, in pertinent part, that the combination of AMC and Carmike was "expected to broaden our appeal with moviegoers *with more people having access to the AMC Stubs loyalty program*."[34]

139.    Significantly, Defendant Aron made the statements above without disclosing that Carmike had failed to invest any capital in its theaters during the acquisition, which would result in significant capital expenditures of AMC to remediate.

140.    Regarding the DOJ's regulatory review of the merger, Defendant Aron asserted that: "we did spend eight months with the Justice Department of the United States," and that the

---

[33] Emphasis added.
[34] Emphasis added.

Company expected to divest 15-20 theaters, mainly former Carmike theaters with cash flows in "the modest single-digit millions of dollars." Defendant Aron represented that a buyer had been identified for two theaters, with the remaining theaters to be sold in sixty days.

### The Registration Statement

141.    The version of the Company's Registration Statement, filed December 21, 2016, which was declared effective by the SEC, contained a number of false and misleading statements regarding the Company, its management, operations, financial performance, growth prospects, and the relevant market; failed to disclose known trends, events, demands, commitments and uncertainties that were then having or were reasonably likely to have a material effect on the Company's operating performance; and negligently failed to advise investors about material changes in the Company's affairs. The Registration Statement was signed by Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch and Pawlus.

142.    The Registration Statement incorporated by reference a number of documents, including Carmike's Form 10-Q for the quarter ended September 30, 2016 (the "Q3 2016 Carmike 10-Q").

143.    The Q3 2016 Carmike 10-Q contained false and misleading statements regarding Carmike's revenue growth over the first three quarters of 2017. The Registration Statement stated, in relevant part:

> *Revenues*. We collect substantially all of our revenues from the sale of admission tickets and concessions. The table below provides a comparative summary of the operating data for this revenue generation.

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2016 | 2015 | 2016 | 2015 |
| Average theatres | 272 | 269 | 274 | 271 |
| Average screens | 2,928 | 2,875 | 2,940 | 2,885 |
| Average attendance per screen | 5,898 | 5,320 | 16,624 | 16,859 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Average admission per patron | $ | 7.30 | $ | 7.23 | $ | 7.59 | $ 7.36 |
| Average concessions and other sales per patron | $ | 4.85 | $ | 4.55 | $ | 5.11 | $ 4.68 |
| Total attendance (in thousands) | | 17,269 | | 15,294 | | 48,874 | 48,475 |
| Total operating revenues (in thousands) | $ | 209,730 | $ | 180,241 | $ | 620,592 | $ 583,674 |

144.    The Q3 2016 Carmike 10-Q continued, discussing operating revenues for the quarter:

> Total operating revenues increased 16.4% to $209.7 million for the three months ended September 30, 2016 compared to $180.2 million for the three months ended September 30, 2015, due to an increase in total attendance from 15.3 million in the third quarter of 2015 to 17.3 million in the third quarter of 2016, an increase in average admissions per patron from $7.23 in the third quarter of 2015 to $7.30 in the third quarter of 2016 and an increase in average concessions and other sales per patron from $4.55 in the third quarter of 2015 to $4.85 in the third quarter of 2016. Excluding operating revenues from the acquired Sundance theatres which totaled $5.8 million, total operating revenues increased 13.1% to $203.9 million. The increase in total revenues, excluding the acquired Sundance theatres, was due to an increase in attendance from 15.3 million in the third quarter of 2015 to 17.0 million in the third quarter of 2016, an increase in average admissions per patron from $7.23 to $7.24 and an increase in average concessions and other sales per patron from $4.55 to $4.77. The increase in average admissions per patron for the third quarter of 2016 was due to the adoption of a tax on top pricing policy in the fourth quarter of 2015, the acquired Sundance theatres and revenues related to unredeemed gift cards, partially offset by summer promotional activities introduced in 2016. Average concessions and other sales per patron increased primarily due to concession promotions, expanded food and beverage menus at certain theatres, including our in-theatre dining locations, the adoption of a tax on top pricing policy in the fourth quarter of 2015 and revenues related to unredeemed gift cards.

145.    The Q3 2016 Carmike 10-Q continued, discussing operating revenues for the nine months ended September 30, 2016:

> Total operating revenues increased 6.3% to $620.6 million for the nine months ended September 30, 2016 compared to $583.7 million for the nine months ended September 30, 2015, due to an increase in total attendance from 48.5 million for the nine months ended September 30, 2015 to 48.9 million for the nine months ended September 30, 2016, an increase in average admissions per patron from $7.36 for the nine months ended September 30, 2015 to $7.59 for the nine months ended September 30, 2016 and an increase in average concessions and other sales per patron from $4.68 for the nine months ended September 30, 2015 to $5.11 for the nine months ended September 30, 2016. Excluding operating revenues from the acquired Sundance theatres which totaled $16.2 million, total operating revenues increased 3.5% to $604.4 million. The increase in total

44

operating revenues, excluding the acquired Sundance theatres, was due to an increase in attendance from 48.5 million for the nine months ended September 30, 2015 to 48.1 million for the nine months ended September 30, 2016, an increase in average admissions per patron from $7.36 to $7.53 and an increase in average concessions and other sales per patron from $4.68 to $5.04. Average admission per patron for the nine months ended September 30, 2016 increased due to the adoption of a tax on top pricing policy in the fourth quarter of 2015, the acquired Sundance theatres and revenues related to unredeemed gift cards, partially offset by summer promotional activities. Average concessions and other sales per patron increased primarily due to concession promotions, expanded food and beverage menus at certain locations, including our in-theatre dining locations, the adoption of a tax on top pricing policy in the fourth quarter of 2015 and revenues related to unredeemed gift cards.

146.    The Q3 2016 Carmike 10-Q proceeded to address admissions revenue:

Admissions revenue increased 13.9% from $110.6 million for the three months ended September 30, 2015 to $126.0 million for the three months ended September 30, 2016, due to an increase in total attendance from 15.3 million in the third quarter of 2015 to 17.3 million in the third quarter of 2016, an increase in average admissions per patron from $7.23 in the third quarter of 2015 to $7.30 for the third quarter of 2016, and revenues related to unredeemed gift cards. Excluding admissions revenue from the acquired Sundance theatres of $3.1 million, admissions revenue increased 11.1% from $110.6 million for the three months ended September 30, 2015 to $122.9 million for the three months ended September 30, 2016.

147.    Finally, the Q3 2016 Carmike 10-Q addressed concessions revenue:

Further, Concessions and other revenue increased 20.3% to $83.7 million for the three months ended September 30, 2016 compared to $69.6 million for the same period in 2015 due to an increase in total attendance from 15.3 million for the three months ended September 30, 2015 to 17.3 million for the three months ended September 30, 2016, and an increase in average concessions and other sales per patron from $4.55 in the third quarter of 2015 to $4.85 in the third quarter of 2016, the adoption of a tax on top pricing policy in the fourth quarter of 2015 and revenues related to unredeemed gift cards. Excluding concessions and other revenues from the acquired Sundance theatres of $2.7 million, concessions and other revenue increased 16.4% from $69.6 million for the three months ended September 30, 2015 to $81.0 million for the three months ended September 30, 2016.

Concessions and other revenue increased 10.2% to $249.7 million for the nine months ended September 30, 2016 compared to $226.7 million for the same period in 2015 due to an increase in total attendance from 48.5 million for the nine months ended September 30, 2015 to 48.9 million for the nine months ended September 30, 2016, an increase in average concessions and other sales per patron

from $4.68 for the 2015 period to $5.11 for the 2016 period, revenues related to unredeemed gift cards and settlement funds related to the 2010 BP oil spill of $0.7 million. Excluding concessions and other revenues from the acquired Sundance theatres of $7.3 million, concessions and other revenues increased 6.9% to $242.4 million in the 2016 period from $226.7 million in the 2015 period.

148.    Regarding the seasonality of AMC's business, the Registration Statement asserted that "[t]he most attended films are usually released during the summer and the calendar year-end holidays, making our business highly seasonal."

149.    Further, the Registration Statement incorporated by reference AMC's Form 10-K for the fiscal year ended December 31, 2015 filed with the SEC on March 8, 2016 (the "2015 10-K"). Regarding the seasonality of AMC's business, the 2015 10-K stated:

> Our revenues are dependent upon the timing of motion picture releases by distributors. The most marketable motion pictures are usually released during the summer and the year-end holiday seasons. Therefore, *our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons.* Our results of operations may vary significantly from quarter to quarter.[35]

150.    As noted above, movie attendance, and theater revenues, tend to drop in Europe during the summer months. As a result, the statements regarding seasonality made and incorporated by reference into the Registration Statement was materially false and misleading. Instruction 11(a) of Form S-3 requires that a Registration Statement be updated to disclose "any and all material changes" in a Company's affairs, and 17 C.F.R. § 229.101(c)(1)(v) requires that the Registration Statement disclose the seasonal nature of each of the Company's business segments. In this instance, the fact that summer attendance is generally lower in the Company's newly acquired European theaters should have been disclosed, especially in light of the Company's decision to report its financial results for its European theaters in a separate segment from its U.S. operations.

---

[35] Emphasis added.

151.    Further, the Registration Statement failed to disclose that gross margins on food and beverage sales, AMC's second highest source of revenue, were and are materially lower for the Company's newly acquired international business than had been historically reported for domestic operations. For its international operations, food and beverage costs as a percentage of revenue are approximately 50% greater than for domestic operations.

152.    In violation of disclosure regulations, the Registration Statement also failed to disclose the following trends, events, demands, commitments and uncertainties that were known to management and, at the time of filing, were having or reasonably likely to have a material adverse effect on the Company's operating performance: (1) the operations of Carmike had been experiencing a prolonged period of financial underperformance due, in large part, to an extended period of underinvestment in its theaters; and (2) AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition.

153.    The Registration Statement also failed to disclose material information about Carmike that the Individual Defendants were privy to during the SPO. While the Registration Statement touted that Carmike was "a U.S. leader in digital cinema" and was "one of the nation's largest motion picture exhibitors." The Registration Statement maintained that "As of September 30, 2016, Carmike had 271 theatres with 2,917 screens in 41 states. The circuit includes 55 premium large format ('PLF') auditoriums featuring state-of-the-art technology and luxurious seating, including 32 'BigDs,' 21 IMAX auditoriums and two MuviXL screens. As 'America's Hometown Theatre Chain' Carmike's primary focus is mid-sized communities." In particular, these statements failed to disclose to the investing public that a number of Carmike's theaters that could not support AMC-style renovations were in a state of significant disrepair caused by Carmike's prolonged failure to invest in them. As such, these theaters would require substantial

capital to renovate. Defendants had a duty to disclose information regarding Carmike's capital underinvestment in its theaters. Additionally, AMC faced significant challenges retaining customers that formerly participated in Carmike's loyalty program and converting new customers.

154.    Furthermore, the Registration Statement failed to disclose that these material omissions were foreseeably likely to and did in fact subvert the cost synergies the Company expected to achieve soon after the Carmike acquisition took place.

### *Nordic Press Release and Conference Call*

155.    The Company issued a press release on January 23, 2017 announcing that it had entered into a definitive agreement to acquire Nordic, which was the largest theater exhibitor in seven Northern European countries (the "Nordic Press Release"). The Nordic Press Release noted that Nordic operated 68 theaters and had a substantial minority interest in another 50 associated theaters. Following the Nordic acquisition, AMC's domestic operations accounted for 70% of its total attendance, screens and revenue, with Odeon and Nordic accounting for the remaining 30%.

156.    On January 23, 2017, the Company held a conference call with analysts and investors to discuss the Nordic acquisition (the "Nordic Conference Call"). During the Nordic Conference Call, Defendant Aron described the integration of Carmike and Odeon as "flawless," stating, in relevant part:

> So far, vis-a-vis ***Carmike and Odeon, our efforts as best we can tell, surrounding integration planning and integration execution have been flawless***. We fully expect this also will be the case on our third go-round in one year. With some practice, ***we're getting pretty good at putting companies together***, and of course everyone knows the old saying, about how you get to Carnegie Hall.[36]

157.    Defendant Aron also expressed confidence that the acquisitions would boost the Company's performance going forward, stating:

> ***Allocating our capital*** so dramatically ***to growth through acquisition***, in both our

---

[36] Emphasis added.

theater count and countries served *obviously confirms that AMC is confident and optimistic about the future of being in the movie theater business*. We further believe that confidence is well-placed.[37]

158.    Defendant Aron touched on the Company's growth strategy, specifically noting acquisitions, renovations, and the Company's loyalty program as factors that would generate growth, stating:

> I think *AMC has grown smartly this year, through M&A activity*. It's not the only way we've grown, but I like our new website, and *I like our new AMC Stubs loyalty program*, and I like our new pricing department*, and they're going to help us grow revenues and grow EBITDA*, too. But, and we are obviously investing in renovating theaters in the US and putting in recliner seating to another third of our circuit over the next two years, *so there's plenty that's going to cause growth*.[38]

159.    Although Defendant Aron touted AMC's new loyalty program, he failed to disclose that most of Carmike's customers were lost once the acquisition had been completed, and as such, AMC "had to start the loyalty program essentially from scratch."

160.    Defendant Aron further asserted that the Company's foreign acquisitions would be completed in time for AMC to benefit from a "busy summer film slate," stating:

> Like in our Odeon transaction, European Commission approval will be required for closing, but as we've had recent experience with [the] EU, and as we have no theaters in these seven Northern European countries presently, we believe that securing EU approval should be both painless and quick. *We expect closing to happen well within the first half of 2017, and ahead of the busy summer film slate*.[39]

However, Defendant Aron did not disclose that such benefits would be offset by seasonal factors, or that the seasonality of movie attendance in Europe was not comparable to that in the U.S. Furthermore, Defendant Aron failed to disclose that Carmike's prolonged underinvestment and AMC's failure to retain or convert customers to the loyalty program following the acquisition of

---

[37] Emphasis added.
[38] Emphasis added.
[39] Emphasis added.

Carmike would have a significant negative impact on the Company's own resources, capital, and operations.

### The Prospectus Supplements

161.    On February 7 and 9, 2017 the Company filed the Prospectus Supplements, which contained substantially the same information presented in the Registration Statement. Therefore, the Prospectus Supplements were false and misleading in the same ways, and for the same reasons, as the Registration Statement.

### February 2017 Press Release and Conference Call

162.    The Company issued a press release on February 28, 2017 announcing financial results for the quarter and year ended December 31, 2016. The press release noted that AMC had a record-setting fourth quarter and year across all revenue categories. Further, the press release asserted that the SPO proceeds would be used to pay for the Company's recent acquisitions. The press release stated, in relevant part:

> In connection with the acquisitions of Odeon/UCI and Carmike, and the planned acquisition of Nordic, in February 2017 AMC raised more than $640 million of additional equity through the sale of 20,330,874 shares of the Company's Class A common stock, par value $0.01 per share, at $31.50 per share.
>
> The net proceeds of the offering were approximately $618.0 million after deducting underwriting commissions and before deducting estimated offering expenses. *AMC used the net proceeds from this offering to repay $350 million principal amount of outstanding bridge loans incurred in connection with its completed acquisition of Carmike Cinemas, Inc. and intends to use the remaining proceeds to finance a portion of the previously announced acquisition of Nordic*. If the Nordic acquisition is not consummated, AMC will use the net proceeds from the offering for general corporate purposes.[40]

163.    Defendant Aron provided the following comments regarding the financial results:

> Our innovations with powered recliner seats, enhanced food and beverage initiatives and the expansion of premium large format offerings, combined with AMC's world class marketing efforts, has created industry defining guest

---

[40] Emphasis added.

experiences and engagement. In concert with a prudent and opportunistic acquisition strategy, 2016 resulted in the successful acquisition of Odeon, Europe's largest movie exhibitor, and Carmike Cinemas, the nation's then fourth largest domestic exhibitor, and presented AMC with the opportunity to acquire Nordic Cinema Group, announced in January of 2017. AMC has never been better positioned to leverage our proven strategic initiatives across a growing platform both here in the U.S. and across the globe.

164.    Later that same day, the Company held a conference call with analysts and investors to discuss the Company's earnings release and operations. During the call, Defendant Aron made the following statements regarding the seasonality of AMC's newly acquired international operations:

> Internationally, for the year, the year being defined as November 30 to December 31, the time in which we owned Odeon, total revenues were in Europe were . . . $118.9 million, and adjusted EBITDA was $28.4 million.
>
> Please keep in mind that this adjusted EBITDA in Europe is a result of *December* movies, *one of the busiest months of the year* and should not be extrapolated merely by multiplying by 12 for full-year 2017.[41]

165.    Defendant Aron further represented that the Company's integration of Carmike had "begun . . . in earnest," with AMC having identified "$35 million of cost synergies" associated with the Carmike acquisition, which were expected to be "substantially realized" over the following ten months. In relevant part, Defendant Aron stated:

> Carmike offers AMC complementary markets in suburban and rural regions of the country, with little market overlap and gives AMC a truly national footprint.
>
> We will deploy some of our strategic growth initiatives at every Carmike Theater and many will be renovated full-blown with recliner seating. *We have also identified $35 million of cost synergies, which we believe will be substantially realized by the end of 2017. We've already begun the integration in earnest*, converting point-of-sale systems and vendor contracts and commencing initiative deployments.[42]

---

[41] Emphasis added.
[42] Emphasis added.

166.    Defendant Aron lauded the fact that AMC had set all-time records for EBITDA and

revenue in 2016, which the Company would "literally shatter in 2017." Defendant Aron stated, in

relevant part, that in 2016:

> *AMC set new all-time high records for every revenue segment and adjusted EBITDA, exceeding $3 billion in total revenues for the first time ever, growing nearly 10% to a record $3.2 billion. That $3.2 billion record we set in 2016 is one that we will literally shatter in 2017,* with revenues that are likely to well exceed $5 billion.[43]

167.    Defendant Aron did acknowledge that in 2017 Carmike would incur start-up and

transition costs, while the benefits of reseating theaters were not projected to be visible until late

2017 and into 2018. Defendant Aron stated, in pertinent part:

> 2017 will be a transition year for Odeon and Carmike Theaters. *There are startup and transition costs*; additionally, since the *recliner renovations* deployments take on average six to 12 months to complete and although we have already begun, the lift in these *investments won't be visible until very late in 2017 and well into 2018*. Having said all that, these are absolutely the right investments to make and *we are very confident in their earnings power*.

> The Carmike acquisition combined, as you know, the number two and number four circuits in the US to create the largest exhibition circuit in the U.S. Carmike offers AMC . . . complementary markets in suburban and rural regions of the country, with little market overlap and gives AMC a truly national footprint. *We will deploy some of our strategic growth initiatives at every Carmike theater and many will be renovated full-blown with recliner seating*.

> We have also identified $35 million of cost synergies, which we believe will be substantially realized by the end of 2017. We've already begun the integration in earnest, converting point-of-sale systems and vendor contracts and commencing initiative deployments.

168.    With respect to the Company's loyalty program, Defendant Aron touted its

expansion, stating, in pertinent part:

> During the latter half of 2016, we revolutionized our already successful loyalty program, redesigning and relaunching AMC Stubs. AMC Stubs had been locked in with about 2.5 million member households but without meaningful growth in some

---

[43] Emphasis added.

three years. By contrast, ***membership in the redesigned AMC Stubs has simply exploded***.

AMC Stubs membership has just recently crossed over the six million member household mark. Some 5.5 million of these households have purchased an AMC ticket in the past 12 months and all have had some interaction with us in the past 24 months. ***With sign-up rates of a stunning 400,000 to 500,000 new member households continuing right now each month***, we hope that we can reach 10 million member households in the AMC Stubs program and the AMC customer database sometime in 2017.

169.    Defendant Aron continued, lauding the size of the program and its value to AMC:

With an average of roughly three to four family members per household, our consumer database has already grown to approximately 20 million known moviegoers and should rise to 30 million to 40 million known moviegoers by later this year. To whom, we are marketing one to two times each week to sway them to see a movie, the kind of movie that they individually prefer based on past purchases and to do so at an AMC theater.

***I just cannot emphasize enough the value to our Company of this consumer data and information. We intend to creatively mine this rapidly growing consumer database to increase sales and otherwise boost loyalty to AMC***.

170.    Regarding other AMC marketing programs, Defendant Aron stated, in relevant

part:

Further evidence of our marketing prowess can be found in the relaunch of the AMC website and mobile apps on November 30.... For the fourth quarter, online ticketing represented more than 31% of our total ticket sales. ***AMC's online presence has experienced phenomenal growth***, ***seeing a 1,000 basis point increase compared to last year*** and the percentage of online tickets being sold through the website and apps.

***More recent data indicates that AMC's mobile app ticket sales and AMC's website ticket sales are up even more***. Just last week, movie tickets sold on the AMC website were up 93%, 9-3, 93% and movie tickets sales from our smartphone apps were up some 77%, 7-7, 77% year over year. This result emboldens us to do even more. Activities are already underway to heighten our social media presence. We're also starting to test creative a pricing concepts, and we have a raft of good ideas for new marketing programs and new marketing activity that will be launched in 2017 that we are highly confident will take sway with consumers in AMC's direction.

171.   During the question and answer portion of the conference call, an analyst asked about the benefits "from the remodels vis-à-vis attendance lift and box office lift," seeking to understand the drag that theaters without enhanced seating or concession options were having overall. In response, Defendant Aron stated, in relevant part:

… [W]hat is the difference between the renovated theaters and non-renovated theaters? . . .

Where we are exposed, and where I believe our competitor is exposed, is that our renovated theaters, whether they were renovated three months ago or 24 months ago, *our renovated theaters, as a class, are doing extremely well, with significant double-digit revenue growth that would blow your mind if we shared that number with you*.

But, *the non-renovated theaters are growing at single-digit growth*, which blows our minds because we are the same Company, which shows us the power of recliner seats. So, our conclusion is the faster we can renovate theaters, the better off we are.

. . . you'll start to see Carmike cinemas getting renovated in 2018 but, that's probably a 2018, 2019, and – or 2018 and 2019, or 2018, 2019 and 2020 renovation plan. *There is no doubt that renovated theaters are just killing in the marketplace*.

*Consumers are voting with their feet. And our way to handle that is to have more theaters that are renovated than anybody else* and it will be by a country mile. We already have a big lead over any other large circuit in terms of renovation, and our plans for 2017 and 2018 are more aggressive than anybody else as well.

***The 2016 10-K***

172.   On March 10, 2017, the Company filed the 2016 10-K with the SEC, which reported its financial results for the quarter and year. The 2016 10-K was signed by Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch and Pawlus. The 2016 10-K contained materially false and misleading disclosures regarding: (1) Carmike's operations; (2) the seasonality of the Company's foreign operations; (3) AMC's loyalty program; (4) management's discussion and analysis of financial conditions and results of operations; and (5) the Company's disclosure controls. Further, in violation of U.S. Generally Accepted Accounting Principles

("GAAP"), the 2016 10-K failed to disclose that theater attendance is generally lower in the summer months in AMC's international business, which AMC reported as a separate business segment from its U.S. operations.

173.    The 2016 10-K discussed the economic impact of the locations of legacy Carmike theaters, stating, in relevant part:

> [T]he former Carmike theatres we acquired in 2016, are located primarily in smaller, suburban and rural markets, we do expect our total revenues per theatre to be impacted going forward. However, in general, theatres located in smaller suburban and rural markets tend to have less competition and a lower cost structure. . .

174.    The 2016 10-K discussed the Carmike acquisition, stating, in relevant part:

> [W]e completed the acquisition of Carmike for cash and stock. The purchase price for Carmike was $858,240,000 comprised of cash of $584,291,000 and 8,189,808 shares of our Class A common stock with a fair value of $273,949,000 (based on a closing share price of $33.45 per share on December 20, 2016). We also assumed $230,000,000 aggregate principal amount of 6.00% Senior Secured Notes due June 15, 2023 (the "Senior Secured Notes due 2023"), in connection with the acquisition of Carmike. As of December 21, 2016, Carmike operated 271 theatres with 2,923 screens in small and mid-sized markets in 41 states, which further complements our U.S. markets segment. ***We expect to realize approximately $35,000,000 of synergies and cost savings related to this acquisition as a result of purchasing and procurement economies of scale and general and administrative expense savings, particularly with respect to the consolidation of corporate related functions and elimination of redundancies.***[44]

175.    Regarding the seasonality of AMC's business, the 2016 10-K stated, in relevant part:

part:

> Our revenues are dependent upon the timing of motion picture releases by distributors. The most marketable motion pictures are usually released during the summer and the year-end holiday seasons. Therefore, ***our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons***. Our results of operations may vary significantly from quarter to quarter.[45]

---

[44] Emphasis added.
[45] Emphasis added.

176.     Regarding the Company's loyalty program, the 2016 10-K stated, in relevant part:

AMC is engaging moviegoers with world-class and industry-leading marketing activities to strengthen the bonds with our current guests and create new connections with potential customers that drive both growth and loyalty. This effort begins with the legacy AMC loyalty program, AMC Stubs®, which we believe is one of the most popular loyalty programs in the industry. AMC Stubs® is a customer loyalty program which allows members to earn rewards, receive discounts and participate in exclusive members-only offerings and services. In July 2016, we completed a national relaunch of our AMC Stubs® loyalty program featuring both a traditional paid tier called AMC Stubs Premiere™ and a new non-paid tier called AMC Stubs Insider™. Both programs reward loyal guests for their patronage of AMC theatres. The AMC Stubs Insider™ tier rewards guests for simply coming to the movies, and benefits include free refills on certain food items, discount ticket offers, a birthday gift and 20 reward points earned for every dollar spent. For a $15 annual membership fee, AMC Stubs Premiere™ members enjoy express service with specially marked shorter lines at the box office and concession stand, free size upgrades on certain food and beverage items, discount ticket offers, a birthday gift, discounted online ticketing fees and 100 points for every dollar spent. Some of the rewards earned are redeemable on future purchases at AMC locations.

177.     The 2016 10-K continued, lauding member growth in the loyalty program:

As of June 30, 2016, prior to our national relaunch, we had 2,672,000 active member households in the AMC Stubs® program. As of December 31[,] 2016, we had more than 5,263,000 active member households enrolled in both the AMC Stubs Premiere™ and AMC Stubs Insider™ programs, combined. New members are enrolling in the new AMC Stubs® program at a rate greater than 11 times the number of enrollments during the same period in 2015. Our AMC Stubs® members represented approximately 23% of legacy AMC attendance during the year ended December 31, 2016. We expect the number of member households to double over the next 24 to 36 months. We believe movie-goers want to be recognized and rewarded for attending our theatres and as a result, our new AMC Stubs® program is designed to strengthen guest loyalty, attract new guests and drive additional return visits. Our much larger database of identified moviegoers also provides us with additional insight into our customers' movie preferences, and this enables us to have both a larger and a more targeted marketing effort to support our Hollywood studio partners. We intend to creatively mine this rapidly growing consumer database to increase sales and otherwise boost loyalty to AMC.

178.     Similar to the aforementioned statements, the 2016 10-K failed to disclose that the

Company's operations were being negatively impacted by the Company's failure to retain or

convert Carmike's loyalty program customers to the Company's new "AMC Stubs" program. The

2016 10-K failed to disclose that a mere 200,000 Carmike loyalty program members opted to join the Company's AMC Stubs after the acquisition took place and as such, the Company "had to start the loyalty program essentially over from scratch."

179.    With respect to AMC's plan to renovate Carmike theaters, the 2016 10-K stated in relevant part:

> As of December 31, 2016, we now feature recliner seating in approximately 190 theatres, including Dine-in Theatres, totaling approximately 1,984 screens and representing approximately 35% of total legacy AMC screens. By the end of 2017 and 2018, we expect legacy AMC theatres to operate 2,650 and 3,350 screens with recliner seating, respectively. Based on feedback from our guests, we believe there is universal appeal for the ample space, comfort and convenience of our powered recliners, and that appeal will translate into additional attendance in new markets both domestically and in Europe. ***As such, deploying powered recliners will be an integral strategy in the former Carmike and Odeon circuits going forward as we are targeting approximately 42% of our total screens to be comprised of screens with recliner seating by the end of 2021.***[46]

180.    Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Aron and Ramsey attesting to the accuracy of the 2016 10-K.

***The 2017 Proxy Statement***

181.    On March 17, 2017 Defendants Aron, Saich, Locke, Pawlus, Hill, Zeng, Koch, Zhang, Aron and Gao, solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

182.    The Company's 2017 Proxy Statement states that the Company has "a Code of Business Conduct and Ethics that applies to all of our associates, including our principal executive officer, principal financial officer and principal accounting officer, or persons performing similar

---

[46] Emphasis added.

functions. These standards are designed to deter wrongdoing and to promote honest and ethical conduct."

183.    The 2017 Proxy statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed.

184.    The 2017 Proxy statement was also false and misleading because it failed to disclose that: (1) Carmike had been experiencing a prolonged period of financial underperformance largely due to a protracted period of underinvestment in its theaters; (2) following the Carmike acquisition, AMC was able to retain only a very small number of Carmike's loyalty program members; (3) the issues identified in (1)-(2) above were then having a material adverse effect on Carmike's operations and theater attendance and, as a result, AMC planned to boost attendance at Carmike theaters by materially expanding promotional and capital investment spending activity, expenditures which were reasonably likely to have a material adverse effect on AMC's near term operating results; (4) attendance at AMC's European theaters was slower during the summer season than during the rest of the year; (5) representations concerning Carmike's operations, the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and/or misleading; (6) AMC failed to maintain adequate internal controls; and (7) as a result of the foregoing, the Company lacked a reasonable basis for its positive statements about AMC's then-current business and future financial prospects, including statements relating to AMC's financial guidance, and cost synergies associated with the "flawless" Carmike integration..

*April 19, 2017 Press Release*

185.    The Company also issued a press release on April 19, 2017 "to facilitate greater transparency and clarity" and "providing additional financial disclosure primarily related to its three recent acquisitions." In that press release, Defendant Aron commented:

> We remain committed to providing appropriate and relevant financial disclosure to our shareholders. We believe that with the complexity and close timing of the three transformative acquisitions we have successfully completed in the last five months, the additional disclosure we are providing today, beyond the pro forma financial information we have already published, will be helpful for investors . . . We continue to be excited about the earnings potential for AMC as we have grown to a network of approximately 1,000 theatres and 11,000 screens in 15 countries in the U.S. and Europe. As we deploy our proven growth initiatives across our system, we expect to unlock both near-term and long-term value, as evidenced already by the fact that, as of today we expect to exceed the current FACTSET consensus EBITDA estimate for the first quarter ended March 31, 2017. When appropriate and feasible, we expect to provide additional financial disclosure related to the acquisitions and their contributions for the balance of 2017.

### Q1 2017 10-Q

186.    On May 8, 2017, the Company filed its financial results for the quarter ended March 31, 2017 on Form 10-Q with the SEC (the "Q1 2017 10-Q) which was signed by Defendants Aron and Ramsey. The Q1 2017 10-Q repeated the same false and misleading statements contained in the 2016 10-K.

187.    Attached to the 2017 Q1 10-Q were SOX certifications signed by Defendants Aron and Ramsey attesting to its accuracy.

### Q1 2017 10-Q Press Release and Conference Call

188.    On May 8, 2017, the Company issued a press release announcing its financial results for the quarter ended March 31, 2017, which highlighted the Company's record setting results for the quarter in all revenue categories. In the press release, Defendant Aron commented, in relevant part:

> **AMC is off to a tremendous and record start in 2017**. AMC's ability to purposefully act on the opportunities and innovations that drive growth continues to set us apart and further solidifies our leadership position among movie-theatre

operators in the U.S. and Europe . . . Achieving record *first quarter 2017 Adjusted EBITDA of $251.3 million is tangible evidence of what we have been saying for the better part of a year, that the earnings power of this new incarnation of a larger and more influential AMC is enormous compared to other operators and even to our own recent past.*[47]

189.    Defendant Aron continued, highlighting important developments in Q1 2017, and

acknowledging the "revenue weakness" at Carmike for the first time:

> We would particularly point out three important developments at AMC so far this year. First, at the legacy pre-acquisition AMC theatres, we grew revenues at a meaningfully faster pace than the industry at large, due in part to our commitment to renovating theatres and the strength of our impactful marketing programs. Second, with our domestic acquisition, *our rapid move to achieve cost synergies and efficiencies brought immediate bottom line benefit, offsetting revenue weakness that had been prevalent at Carmike for eight of the twelve months and three of the last four months of 2016. We are directly focused on improving revenues at the acquired domestic theatres, as well as furthering the cost reduction efforts that already are well in hand.* And third, we are thrilled both by our brisk start in driving immediate revenue and earnings growth in constant currency in Europe, and the likelihood that our plans to drive even more earnings through renovation of European theatres will come to initial fruition in quantity as early as the end of 2018.[48]

190.    Defendant Aron concluded by noting that he expected further growth:

> *We are only just beginning to unlock the growth potential of our recent acquisitions. . . . As we now move to make what we expect will be highly lucrative investments in guest-facing initiatives like powered recliner seats, enhanced food and beverage offerings and the expansion of premium large format experiences, we are as confident as we could be in the future earnings potential of AMC.* We remain optimistic about the opportunity to continue to deliver meaningful value to our shareholders both in the balance of 2017 and in the years ahead.[49]

191.    The Company held a conference call later that same day to discuss the Q1 2017

financial results. Defendant Aron lauded the results for the quarter as being "outstanding," stating,

in relevant part:

> AMC's first quarter was marked most noticeably by our growth to more than 1,000 theaters and more than 11,000 screens, thanks to the closing of our Carmike and

---

[47] Emphasis added.
[48] Emphasis added.
[49] Emphasis added.

Odeon acquisitions late in Q4 '16, and the signing and ahead-of-schedule closing of our Nordic Cinema Group acquisition, wholly within Q1 '17.

As for theater enhancement, we quickened the deployment pace for our strategic initiatives, ***with more theaters now equipped with recliner seating than anyone else in our industry, and their attendant investment return metrics still being quite lucrative and well ahead of the 25% cash-on-cash unlevered returns of our investment hurdles*** . . .

Our marketing activity continues to amaze even us. ***Literally all of the Carmike Theaters will cut over to the AMC brands, programs, websites and systems by the end of this week***, with the Carmike name retired.[50]

192.    During the call, Defendant Aron noted the increased customer participation in the

Company's loyalty program, stating:

And speaking of the efficacy of those marketing programs, ***AMC Stubs*** . . . ***participation continues to soar***. As of today, we have 7,553,209 AMC Stubs member households. We previously announced hitting 5 million member households on December 19 of last year; announced 6 million member households on February 13 of this year; and 7 million member households on April 13, less than a month ago. ***So, in a year, we've tripled the Stubs membership to numbers that we believe are light-years ahead of any other exhibitor program and the numbers continue to grow rapidly***.

* * *

***We could not be more excited about our AMC Stubs loyalty program and the redesigned website and mobile apps*** that span the divide between the physical theater setting and the digital experiences our consumers prefer.

As previously mentioned, our rapidly growing number of AMC Stubs members accounted for approximately 25% of all ticket sales in Q1, and will soon account for more than 30% of all AMC moviegoers in the United States. These tens of millions of purchase histories now captured in our database offer us a treasure trove of data and consumer information for us to use to market AMC and future moviegoing more effectively.

Thanks to our new website and smartphone app, both launched on November 30, more and more of our guests are utilizing the AMC website and app to buy their tickets. In the first quarter, we sold 31% of our tickets online; that's a 600-basispoint increase over last year. And of our total online sales, the AMC channels sold 49% of those online tickets. That's a 1,300-basis-point increase compared to last year.

***Clearly, we're developing the desired connections with our guests by offering a***

---

[50] Emphasis added.

***fast, easy and convenient solution that's driving ticket sales.***[51]

193.     Defendant Aron then touted the success of the Carmike integration, stating, in

relevant part:

> As you know, we are retiring the Carmike name and are rebranding all our theaters as AMC, about 400 of the 644; or AMC Dine-In, about 45 of the 644; or AMC Classic, about 200 of the remaining theater locations in the U.S. However, as our AMC and AMC Dine-In Theaters are considerably larger and get considerably more visitation, only about 10% of our revenues will fall under the AMC Classic marquee.
>
> We only have 2 Carmike theaters as we speak, and by the end of this week, all Carmike theaters will have gone through their cutover to AMC systems, processes and brands. ***There have literally been no operational snafus of any note to report*** to you, and the new larger AMC is showing movies every day without pain in a much bigger national footprint.[52]

194.     Regarding theater renovations, Defendant Aron stated, in relevant part:

> We see that our commitment to improving the guest experience continues to serve us and our guests very well. . . .
>
> ***As of March 31, 2017***, including our Dine-In Theater locations, spot acquisitions, new builds, Dolby Cinema auditoriums and full recliner reseat renovations, ***AMC operated 2,078 U.S. recliner screens in 208 theaters. Of the 75 theaters with recliners that have been open for more than a year, these theaters are seeing attendance lifts between 40% and 60%, average ticket price increases of 7% and total revenue increases averaging 64% in the first 12 months after renovation compared to the last 12 months before renovation***.
>
> ***Our recliner renovation investments are still comfortably exceeding our 25% unlevered cash on cash return hurdles, while handily outperforming the first quarter U.S. industry box office revenue per screen*** by 830 basis points and also outpacing U.S. industry attendance per screen by 270 basis points.
>
> In having more recliner screens than any other U.S. circuit, recliners as a percentage of AMC's U.S. theater count are now 32%, virtually all of them in the legacy AMC circuit and very few in the Carmike circuit. As long as the financial returns stay as solid as they are now, we expect to renovate an additional 118 theaters in the United States, representing 1,480 U.S. screens in 2017 and 2018, which would bring us to 326 recliner-equipped theaters in the U.S. That's about 51% of our entire domestic footprint, including all of the theaters of the newly-acquired Carmike circuit, which

---

[51] Emphasis added.
[52] Emphasis added.

were off to a very slow start under prior ownership. ***So, the opportunity with all these recliner -equipped theaters to deliver outsized performance of returns in the immediate term ahead is clear***. Continued investment in our strategic initiatives across both our legacy and acquired theaters will continue to create value for AMC and for our shareholders.[53]

195.     Defendant Aron acknowledged some "revenue weakness" experienced by Carmike during 2016, revealing that he and other AMC directors and officers were aware of that revenue weakness when the transaction was consummated and when the statements alleged above were made. However, Defendant Aron assured investors that AMC expected that the "short-term revenue softness" would "reverse soon":

> *[W]ith Carmike, we have inherited a circuit that was showing revenue weakness in* 8 of the 12 months in 2016 and in 3 of the 4 months in the last trimester of *2016*. Candidly, ***that was one of the allures to us of acquiring Carmike***. As we look to the end of 2017 and into 2018, we are highly confident that AMC's marketing activity and product ideas will generate a meaningful revenue boost to the Carmike theaters just newly added to our domestic platform.
>
> Fortunately, we ***were so aggressive in reducing expense and in achieving expense synergies that the cost savings are offsetting short-term revenue softness*** – again, which I'm quick to add, we expect to reverse soon on our watch.[54]

196.     In response to an analyst's question regarding Carmike's revenue softness and the Company's ability to manage it, Defendant Aron stated:

> With respect to the Carmike theaters, ***when I talk about revenue softness***, I'm not talking about revenue declines. What ***I'm talking about is that the AMC Theatres have been growing faster than the Carmike theaters have been growing***, if you take, though, the totality of it all. So, no, we're – there's no thought to shuttering any Carmike theaters.
>
> That's why AMC revenues are up 6.2% when the industry is up 4%, 5%. That same team is now wholly focused on the Carmike theaters, not only from a system basis but also theater-by-theater. And we're highly confident we're going to make a lot of progress across the Carmike system.

* * *

---

[53] Emphasis added.
[54] Emphasis added.

And so – but it took Carmike a year to get into this position. We said that their revenue softness was 8 months out of 12, so we're not going to get out of it in a week. But I think, as we look to the second half of '17, as we look certainly to '18, we'll start to see the Carmike theaters perform in a really good way. And as I said, something on the order of 2/3 of the incremental dollar drops down to the bottom line.[55]

197.     Near the end of the call, Defendant Aron opined on the success of Carmike theaters

since the acquisition:

On the issue of Carmike, I – it's really complicated. There are a ***lot of Carmike theaters that are doing just great. So, we've gotten quite granular looking theater by theater by theater***, and there are so many reasons. And I want to be careful what I say because I don't want to say anything uncharitable to the prior management team. It's a problem that we inherited. It's a problem that we'll solve.[56]

198.     Defendant Aron continued, exploring reasons why Carmike theaters were not

growing as fast as AMC legacy theaters:

You could imagine, with any company that announced it was for sale in March and got sold in December, that decisions that might have been taken to drive short-term performance might have been put on hold, thinking those are more appropriate decisions that should be taken by the new owner. That's one argument.

Another argument is some of the Carmike theaters did have competitive activity around them. And they – since Carmike was not a company that really believed in recliner reseats, they didn't counter some of that competitive activity by putting in re-seated theaters of their own. Clearly, that's something that will change.

When we have a theater that we renovate, we do it in 3 to 6 months. ***Two of the largest theaters in their system, they shut down for renovation***, and I believe they're going to be closed for 15 months – which, again, I know it's only 2 theaters out of 270, but when they're significant theaters of size and when you're starting to look at all these things on 0.10% here and 1% over there, ***it matters***.

There's a lot more than that. We've already taken 5 of their theaters. For example, that they had as sub-run theaters, meaning they're showing older films, and we've already converted those – at a very deeply discounted price. We've already converted those theaters to first-run movie houses, showing the latest Hollywood releases at full price.

So, there are a lot of reasons there – for as many of their theaters, there are sort of

---

[55] Emphasis added.
[56] Emphasis added.

reasons that affect big patches of their theaters, and we think we have a solid understanding of what the issues have been, theater by theater, and we're putting in solutions, theater by theater.[57]

199.    Defendant Aron concluded by noting his optimism about Carmike's prospects:

The Carmike theaters in question have only been branded as AMC theaters in the last 30, 60, 90 days. The first cut-over was mid-January, and the last cut-over is going to be mid-May. So, as these theaters become AMC-branded theaters with more **potent marketing programs** and the like and **some targeted investment to improve the product**, we think we'll see real benefits.

So, we're not at all upset about all this. **It's just more upside to come**. And I said it before, but I'll say it again, thank goodness we moved fast to get cost synergies because that's one of the things that allowed us to have a blowout quarter, even with these Carmike issues to deal with.[58]

200.    Notably, Defendant Aron in the aforementioned statements talked extensively about Carmike's operations, performance, and former management. However, Defendant Aron failed to disclose that Carmike's previous management allowed Carmike theaters to "essentially [go] on dead stop" during the acquisition period, which would result in costly remediation efforts by AMC.

201.    The statements referenced above in ¶¶ 131-138, 140-149, 155-177, 179-180, and 185-199 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, prospects, and legal compliance, which were known to Wanda and the Individual Defendants or recklessly disregarded by them. Specifically, Wanda and the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose that: (1) Carmike had been experiencing a prolonged period of financial underperformance largely due to a protracted period of underinvestment in its theaters; (2) following the Carmike acquisition, AMC was able to

---

[57] Emphasis added.
[58] Emphasis added.

retain only a very small number of Carmike's loyalty program members; (3) the issues identified in (1)-(2) above were then having a material adverse effect on Carmike's operations and theater attendance and, as a result, AMC planned to boost attendance at Carmike theaters by materially expanding promotional and capital investment spending activity, expenditures which were reasonably likely to have a material adverse effect on AMC's near term operating results; (4) attendance at AMC's European theaters was slower during the summer season than during the rest of the year; (5) representations concerning Carmike's operations, the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and/or misleading; (6) AMC failed to maintain adequate internal controls; and (7) as a result of the foregoing, the Company lacked a reasonable basis for its positive statements about AMC's then-current business and future financial prospects, including statements relating to AMC's financial guidance, and cost synergies associated with the "flawless" Carmike integration. In breach of their fiduciary duties, Wanda and the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

202.    Moreover, Wanda and the Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

203.    In further breach of their fiduciary duties, Wanda and the Individual Defendants failed to maintain internal controls.

**The Truth Emerges**

***August 1, 2017 Press Release***

204.    After markets closed on August 1, 2017, the Company issued a press release announcing its preliminary financial results for the quarter ended June 30, 2017. The press release announced expected revenues for the quarter of between $1.2 and $1.204 billion, and a net loss of between $178.5 million and $174.5 million—approximately $1.36 to $1.34 per diluted share. For fiscal 2017, the press release announced expected revenues of $5.1 to $5.23 billion, and a net loss of $150 to $125 million, or $1.17 to $0.97 per diluted share.

205.    On this news, the price per share of AMC stock dropped $5.60, or nearly 27%, to close at $15.20 on August 2, 2017.

### *August 4, 2017 Conference Call*

206.    On August 4, 2017, the Company held a conference call with investors and analysts to discuss the Company's financial results for the quarter ended June 30, 2017. Defendant Aron stated that the quarter was "simply a bust," highlighting several reasons for AMC's poor quarterly results.

207.    One such reason was the seasonality of the Company's international business. Defendant Aron revealed, for the first time, that "Q2, seasonally, is often the smallest quarter of the year in Europe."

208.    During the question and answer session, a securities analyst asked if there was "a reason why [they] weren't able to disclose [the seasonality of AMC's international business]?" Defendant Aron responded that the reason for the non-disclosure was that AMC's international operations had been accounted for under international accounting standards. However, this answer appeared to be a non-sequitur, as the seasonality of the Company's international business is not dependent on the accounting standard used. Following these releases, analysts called out the

seasonality of the Company's international business, with one analyst noting that such seasonality "played a role in our (and likely the Street's) mismodeling of the quarter."

209.    Defendant Aron highlighted Carmike's contribution to the Company's underwhelming Q2 financial results, explaining that "[o]ur legacy AMC theaters were stars, outperforming the industry, but our acquired Carmike theaters . . . were not stars." He further explained that during the quarter, nationwide box office revenues were down 4.4%, while admissions revenue at legacy AMC theaters was only down 3.1%. By contrast, the acquired Carmike theaters experienced a 11.3% decline during the quarter, which was 150% more than the national average.

210.    Defendant Aron further acknowledged that all of the "substantial savings" realized during the second quarter of 2017 were "absorbed by and offset by higher operating costs," such as theater upgrades.

211.    During the call's question and answer session, Defendant Aron identified six different issues that had been having a material adverse effect on Carmike's operations and attendance, which the Company anticipated would not be resolved before 2018. Among the issues noted were: (1) two of Carmike's "biggest, most successful" theaters had been shuttered; (2) following the acquisition, only a small number of Carmike's loyalty program members had joined AMC's loyalty program; and (3) Carmike had lost business to competitors who had upgraded or renovated their facilities.

212.    In pertinent part, Defendant Aron stated:

> When you look at ***what Carmike as a company*** did between April and December ***to modernize its circuit*** after it put itself under contract to be sold, it ***didn't do very much. And so, the circuit essentially went on dead stop*** around April-ish of – remember, we put them under contract in March, April-ish of '16, and we didn't get to change that until December of '16. What ***we found*** is that we've already gone through each of the several hundred Carmike theaters one by one with this – across

the top – departmental team that I've told you about, and ***there are literally 6 different reasons that tend to come up most often*** as to what's going on in a particular theater.[59]

213.    With regard to the loyalty program, Defendant Aron represented that the Company would have to start "from scratch" following the Carmike acquisition, a fact not previously disclosed despite its materiality to AMC:

> I'll give you another. ***When Carmike was handed over to us on December 21, only 200,000 individuals from their loyalty program joined our loyalty program***. Even though – even though, at the same time, AMC has over 9 million people from our loyalty program coming – stemming out of the – by then, it would have been about 7 million in the loyalty program. ***So, we've had to start the loyalty program essentially over from scratch***.[60]

214.    Defendant Aron concluded by noting some of the issues with Carmike, and opined on how long it might take to resolve those issues:

> And as I said, there have been many identified issues. And they got to be knocked down one at a time. And ***as we looked at the issues*** that were floating around the Carmike circuit, ***about 40% of the attendance issues in the Carmike circuit was because somebody came into town and put a recliner theater near a Carmike theater and Carmike never responded***. . . . ***Another issue for Carmike is it had 2 of its biggest, most successful theaters that were closed for renovation***. And the theaters were closed for over a year. And they're just coming back on stream this summer. ***So, we're going to get a material bump theoretically by 2 of their biggest, strongest and best-performing theaters finally reopening and coming back online***. And it's literally issue-by-issue. . . . Can we turn this circuit around in 9 months? So, is it January to March of '18? Or is it taking us 12 months and it's January to June of '18? Or does it taking us slightly longer than that? I don't know. But I'm hopeful that we can get it sorted out and turned in the first half of '18.[61]

215.    Defendant Aron further stated that "it's going to take us a good year to essentially turn around Carmike. So, I think this [underperformance] is going to continue with us until '18."

216.    Once again, this represented a decrease in net sales compared to the same quarter the prior year when accounting for sales attributable to acquisitions.

---

[59] Emphasis added.
[60] Emphasis added.
[61] Emphasis added.

217.   After announcing its disappointing results for the second quarter of 2017, the Company began selling assets, including its 50% stake in distribution company Open Road Films, which it had co-founded with rival Regal Entertainment.

**Defendants Acted Knowingly or at Least Recklessly**

*AMC's Due Diligence Efforts*

218.   Wanda and the Individual Defendants made and/or allowed the dissemination of the aforementioned false and misleading statements and omissions despite having full awareness that AMC's own performance was being negatively impacted by Carmike's prolonged period of capital underinvestment. These matters remained undisclosed despite their materiality to the Company's business operations.

219.   As expounded upon herein, Wanda and the Individual Defendants were intimately aware of Carmike's operations. Indeed, by May 2017, Defendant Aron admitted that Carmike's revenue weakness in 2016 had been one of the "allures" of acquiring Carmike at the time. In response to questions posed by analysts about Carmike during the Relevant Period, the Individual Defendants, stated that the Company had "quite a bit of time to go through [Carmike's] books" while AMC was involved in the due diligence process. Defendant Aron specifically told investors that the Company had "spen[t] eight months with the Justice Department of the United States" in connection with AMC's due diligence and the DOJ's antitrust regulatory review of the merger.

220.   The time spent engaged in the due diligence process allowed Wanda and the Individual Defendants to understand Carmike's business. In fact, Defendant Aron informed investors that through its due diligence, the Company was able to identify which Carmike theaters were suitable for AMC-style renovations. Wanda and the Individual Defendants were privy to this information even before the Relevant Period, as AMC engaged in due diligence when it first

proposed to acquire Carmike in May 2014. As discussed above,  AMC notified Carmike on April 10, 2015 that it was no longer interested in pursuing the merger, informing Carmike that "over time its ***management and board*** grew increasingly less comfortable with the terms of the transaction."[62] Wanda and the Individual Defendants were further put on notice about Carmike's underperformance when Carmike announced its 2015 financial results, reflecting Carmike's missed financial targets.

### Core Operations

221.    Moreover, Carmike's acquisition and the ensuing renovations were core operations of the Company during the Relevant Period. Indeed, Wanda and the Individual Defendants touted AMC's growth strategy widely, and Carmike's acquisition was a key component of this, as evidenced by Defendant Aron's eagerness to undertake the acquisition the "week" he began as the new CEO of the Company. Renovating a portion of Carmike's theaters was also part of AMC's overall growth strategy and, coupled with the acquisition, was expected to produce numerous cost synergies. Consequently, Carmike's prolonged failure to invest capital into its theaters and operations would have affected AMC's core operations. The Company's loyalty program and AMC's international operations were also core components of AMC's business, and each served as a substantial source of revenue for the Company. Wanda and the Individual Defendants, as officers, directors, and controllers of the Company, would have been—or should have been aware of the material impact Carmike's underinvestment was having on the Company. Yet, they neglected to disclose material information to the investing public during the Relevant Period, rendering their statements false and misleading when made.

### Motion to Dismiss the Securities Class Action Denied in Part

---

[62] Emphasis added.

222. On September 23, 2019, the Honorable Judge Allison J. Nathan denied in part and granted in part the motion to dismiss filed by defendants in the Securities Class Action. In doing so, the venerable Judge Nathan held that plaintiffs in the Securities Class Action sufficiently alleged that defendants, all of whom are also named herein, omitted material information regarding Carmike's underinvestment in its theaters, Carmike's loyalty program, and the seasonality if the Company's European business, and that plaintiffs plausibly alleged that defendants "failed to disclose this information prior to the SPO." With respect to the challenges surrounding AMC's loyalty program, the MTD Order held that "failure to convert or retain Carmike loyalty program members was plausibly knowable prior to the SPO."[63] The MTD Order outlined that Item 101(c)(1)(v) required disclosure of the seasonality of AMC's international business after the Odeon acquisition when AMC began operating its business via two reportable segments, U.S. markets and International markets.[64]

223. Specifically, the MTD Order held that defendants had a duty to update and that the Company had "an affirmative duty to disclose information relating to Carmike's underinvestment and . . . . [and] was required to disclose this information, at the very least, subsequently to the formal completion of the acquisition of Carmike, which occurred prior to the SPO."[65] Judge Nathan also held that the statements as to AMC's plans to renovate and integrate Carmike into AMC were plausibly misleading by omission, and that based on defendants' statements, an investor could have reasonably inferred that "there were no substantial, systemic obstacles to renovations[]" or to AMC's integration.

---

[63] MTD Order at 17.
[64] MTD Order at 21.
[65] MTD Order at 12.

224.   Moreover, the MTD Order held that plaintiffs plausibly alleged that these statements were knowingly or recklessly false during the time that they were made, holding that several of Defendant Aron's statements supported an inference of scienter that he knew facts or had access to information regarding Carmike's theaters and Carmike's underinvestment as of December 2016. The MTD Order stated that CW1 and CW2  further provided support that this information was communicated to senior executives and that AMC executives were aware of Carmike's infrastructure issues as early as 2014.[66] The MTD Order held that the acquisition and renovation of Carmike were core operations of the Company that would have been impacted by Carmike's underinvestment, further providing a strong inference that Defendant Aron's "'conduct was highly unreasonable' and 'represented an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"[67] Specifically, the MTD Order held in relevant part that plaintiffs sufficiently alleged that the acquisition and renovation of Carmike theaters, the loyalty program, and the seasonality of AMC's international operations were all core operations of AMC that would have been affected by the omissions outlined in the Securities Class Action and herein pertaining to Carmike's underinvestment, the difficulties in converting or retaining Carmike's loyalty customers, and seasonal trends in Europe, as they were all significant sources of income for AMC.[68]

225.   The MTD Order also held that the Company's directors and officers were liable under Sections 11 and 15 of the Securities Act as control persons of the Company because "all of the Individual Defendants either 'signed the registration statement personally or through an

---

[66] MTD Order at 36.
[67] MTD Order at 39, 41 ("Given that the importance of an issue to a corporation supports an inference that an executive would be aware of it, this Court agrees with these other courts that this doctrine continues to be valid in its narrowed form.").
[68] MTD Order at 40.

attorney-in-fact.'"[69] The MTD Order held that plaintiffs adequately pled loss causation based on the sharp decline in the price of Company shares on August 1, 2017. Lastly, the MTD Order held that Defendants Aron and Ramsey were liable as a control persons under Section 20(a) of the Exchange Act, stating specifically, "[b]ecause Plaintiffs allege that both Aron and Ramsey signed the Registration Statement and other SEC filings . . . this is sufficient to allege that they are 'control persons' with the meaning of Section 20(a)."[70]

## **DAMAGES TO AMC**

226.   As a direct and proximate result of Wanda's and the Individual Defendants' conduct, AMC will lose and expend many millions of dollars.

227.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, CFO, its Chief Accounting Officer, seven of the members of its Board, and two former members of its Board, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

228.   Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

229.   Further, the Company was damaged by the false and misleading statements made in the 2017 Proxy Statement, as the 2017 Proxy Statement induced shareholders to reelect Defendants Saich, Locke and Pawlus to the Board, who then continued to harm the Company, giving rise to actionable Section 14(a) claims and breach of fiduciary duty claims.

---

[69] MTD Order at 49.
[70] MTD Order at 49.

230.   As a direct and proximate result of Wanda's and the Individual Defendants' conduct, AMC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Wanda's and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

231.   Plaintiff brings this action derivatively and for the benefit of AMC to redress injuries suffered, and to be suffered, as a result of Wanda's and the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AMC, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

232.   AMC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

233.   Plaintiff is, and has been at all relevant times, a shareholder of AMC. Plaintiff will adequately and fairly represent the interests of AMC in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

234.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

235.   A pre-suit demand on the Board of AMC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Aron, Hill, Koch, Pawlus, Saich, Locke, and Zeng (the "Director-Defendants") and non-parties Philip Lader, Adam J. Sussman, and Lee E. Wittlinger (together with the Director-Defendants, the

"Directors") . Plaintiff needs only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

236.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Indeed, each of the Director-Defendants is a defendant in the Securities Class Action, in which the Court held that plaintiffs sufficiently alleged a primary violation of Sections 11 and 12 of the Securities Act as to all of the Director-Defendants, and control person liability under Section 20(a) of the Exchange Act for Defendant Aron and Section 15 of the Securities Act for the remaining Director-Defendants for failing to disclose material information regarding Carmike's underinvestment in its theaters, AMC's difficulty retaining or converting members of Carmike's loyalty program following the acquisition, and the seasonality of AMC's international theaters.[71] Each of the Director-Defendants "either 'signed the registration statement personally or through an attorney-in-fact.'"[72]

237.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

---

[71] MTD Order at 6,10,16,19.
[72] MTD Order at 49.

238.    The Director-Defendants knew of the falsity of the misleading statements at the time they were made. The acquisitions of Carmike, Odeon, and Nordic were acquisitions of movie theaters. The operation of movie theaters is the core operation of AMC. And, the acquisitions, particularly the acquisition of Carmike, were highly material to the Company's core operations: as of September 30, 2016, prior to the consummation of any of the acquisitions discussed herein, AMC owned, operated or had interests in 388 theatres and 5,295 screens, and Carmike owned, operated or had an interest in 271 theatres with 2,917 screens located in 41 states, as reported in the Company's respective Forms 10-Q for the quarter ended September 30, 2016. Thus, the Carmike acquisition related to the Company's core operations, and increased AMC's theater operations by over 50%. In addition, following the Nordic, Odeon, acquisitions, 30% of the Company's total attendance, screens and revenue were located in Europe, demonstrating the materiality of those acquisitions to AMC's operations. Indeed, the MTD Order in the Securities Class Action held that, because the acquisition of Carmike and renovation of Carmike's theaters were core operations of the Company, the Company would have been materially affected by Carmike's underinvestment in its theaters and operations, which further supported an inference of scienter as to AMC's senior executives, most notably, Defendant Aron.[73]

239.    As Board members of AMC, charged with overseeing the Company's affairs, Defendants Aron, Hill, Koch, Pawlus, Saich, Locke, and Zeng all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of AMC, Defendants Aron, Hill, Koch, Pawlus, Saich, Locke, and Zeng must have been aware of the material facts surrounding the acquisitions described herein, in particular, the poor condition of Carmike's theaters.

---

[73] MTD Order at 39.

240.    Importantly, the members of the Board were on the Board when it approved the Carmike acquisition after having been provided materials by Carmike to do due diligence about the acquisition.  Similarly, they were also on the Board when it approved the Odeon and Nordic acquisitions, and they would have had access to materials provided by those companies to do their due diligence before approving the acquisitions.

241.    This inference of actual knowledge of the misleading statements and omissions at issue is further supported by the due diligence conducted by AMC's management and Board of Directors – on two separate occasions – into the operations of Carmike, and representation in the Carmike Merger Proxy that "over time [AMC's] management ***and board*** grew increasingly less comfortable with the terms of the transaction," ultimately leading AMC not to pursue an acquisition of Carmike in 2015.[74]

242.    Therefore, Defendants Aron, Hill, Koch, Pawlus, Saich, Locke, and Zeng each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions, specifically with respect to Carmike's capital underinvestment.

243.    Additional reasons that demand on Defendant Aron is futile follow. Defendant Aron currently serves as the Company's CEO, and is thus, as the Company admits, a non-independent director. Defendant Aron is responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings and press releases referenced herein, almost all of which he personally made statements in or signed. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged

---

[74] Emphasis added.

above. The MTD Order held that Defendant Aron's statements "relating to AMC's plans to renovate a significant number of Carmike theaters [and statements about Carmike's integration into AMC] were misleading by omission."[75] Specifically, the MTD Order stated in relevant part:

> Over the course of the Class period, Aron continued to describe plans to renovate Carmike theaters . . . . Viewed in context, Plaintiffs have plausibly alleged that an investor could have reasonably inferred from these statements that there were no substantial, systemic obstacles to renovations. The omission of Carmike's underinvestment would thus "conflict with what a reasonable investor would take from the statement itself." *Tongue,* 816 F.3d at 210 (quoting *Omnicare,* 135 S. Ct. at 1329). Accordingly, drawing all inferences in their favor, Plaintiffs have plausibly alleged that these statements were misleading by omission.

> \* \* \*

> It is plausible that an investor would reasonably infer that these statements [describing the integration process as, *inter alia*, "flawless" and "[t]here have literally been no operational snafus of any note"] indicated that Aron had information showing that there were no significant or systemic obstacles to Carmike's integration. This could be misleading, in light of the Carmike's underinvestment and difficulties transferring over Carmike loyalty program members.[76]

244.    Defendant Aron was aware of the falsity of these statements and omissions at the time that they were made, as evidenced by his position as CEO, the fact that the subject of the misleading statements and omissions pertained to material events going to the core operations of the Company, and the fact that he approved and had to have done due diligence on the acquisitions of Carmike, Odeon, and Nordic, and by his admission during a conference call with analysts and investors on December 20, 2016 that "we've had plenty of time to look at the Carmike circuit and plan for the integration." The MTD Order held that confidential witnesses interviewed in connection with the Securities Class Action supported the notion that Carmike was experiencing significant revenue weakness during the due diligence process, and data reflecting that fact was furnished to AMC. Specifically, the MTD Order held that the witness statements provided further

---

[75] MTD Order at 24.
[76] MTD Order at 24.

support for the inference that Defendant Aron "knew or had access to information about Carmike's underinvestment[.]" Further, a confidential witness relayed that AMC was in possession of information, which had been integrated into AMC's financial management system by December 31, 2016, that demonstrated seasonal performance trends at Odeon. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and omissions, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He received lavish compensation, including $10,932,004 in 2016, $4.5 million of which was a cash bonus from Wanda related to the completion of the acquisitions noted above, and $7,447,156 in 2017. This is far higher than what AMC's competitor, Cinemark Holdings, Inc. paid its CEO in the same years ($4,160,638 in 2016 and $4,489,820 in 2017), despite Cinemark Holdings, Inc. having nearly double AMC's market capitalization.[77] Moreover, Defendant Aron is a defendant in the Securities Class Action. The MTD Order held that "several public statements by Aron support the inference that he 'knew facts or had access to information suggesting that' his 'public statements' regarding Carmike theaters 'were not accurate[]'" including his statements related to AMC's due diligence process and the Company's commitment to renovate Carmike's theaters.[78] The MTD Order further held in relevant part:

> the inference as to Carmike's underinvestment in its theaters is less compelling than the inference that Aron 'knew facts or had access to information suggesting that [his] public statements were not accurate.' [citation omitted]. At the very least, there is a strong inference that Aron's 'conduct [was] highly unreasonable' and 'represent[ ed] an extreme departure from the standards of ordinary care to the

---

[77] As of September 6, 2018, Cinemark Holdings, Inc. had a market capitalization of $4.459 billion, whereas AMC's market capitalization was $2.52 billion as of the same date.

[78] MTD Order at 35.

extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'[79]

For these reasons, too, Defendant Aron breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

245.    Additional reasons that demand on Defendant Koch is futile follow. Defendant Koch is responsible for the false and misleading statements and omissions made in the Registration Statement and 2016 10-K, which he signed. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Moreover, Defendant Koch has served as a Company director since October 2014, and is a member of the Nominating and Corporate Governance Committee. Defendant Koch is, as the Company admits, a non-independent director. He received lavish compensation, including $158,704 in 2016. As a member of the Nominating and Corporate Governance Committee, Defendant Koch is responsible for reviewing, on an annual basis, the appropriate criteria that directors are required to fulfill (including experience, qualifications, attributes, skills and other characteristics) in the context of the current make-up of the Board and the needs of the Board given the circumstances of the Company. Thus, Defendant Koch is required to be familiar with the unique circumstances of the Company in order to serve his role on the Nominating and Corporate Governance Committee. Because the subject of the misleading statements and omissions pertained to material events going to the core operations of the Company, and because he approved and had to have to done due diligence on the acquisitions of Carmike, Odeon, and Nordic, given his role, Defendant Koch must have been aware of the falsity of the statements and omissions alleged above at the time they were made, particularly in light of Carmike's underinvestment. As a trusted Company director and

---

[79] MTD Order at 42.

member of the Nominating and Corporate Governance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and omissions, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Koch is a defendant in the Securities Class Action. Defendant Koch received lavish compensation, including $158,704 in 2016. Further, Defendant Koch has had a personal connection with Wang Jianlin, Wanda's founder, since 2013, having travelled to China to consult with Wang Jianlin on the location of a new soundstage business.[80] Defendant Koch also partnered with Wanda in the past to create a film division dubbed The O Project in 2016, which was ultimately derailed by changes in Chinese government policy.[81] He has also been tapped by Wanda to lead business trainings for Wanda employees.[82] These connections, and the promise of future collaborations with and economic opportunities from Wanda and Wang Jianlin, render Defendant Koch unable to evaluate a demand with independence. Thus, for these reasons, Defendant Koch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

246.   Additional reasons that demand on Defendant Locke is futile follow. Defendant Locke is responsible for the false and misleading statements and omissions made in the Registration Statement and 2016 10-K, which he signed. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above.

---

[80] Wayne Ma and Erich Schwartzel, *This Billionaire Had an Oscar Dream, but His Hollywood Ending Was Spoiled by China*, THE WALL STREET JOURNAL (Oct. 4, 2017), https://www.wsj.com/articles/how-chinas-capital-clampdown-torpedoed-a-billionaires-oscar-dream-1507109405
[81] Anita Busch, *Wanda Pulls Financing from 'Arc of Justice,' Indie Film from Hawk Koch and Mark Gordon*, DEADLINE HOLLYWOOD (Sep. 14, 2017), https://deadline.com/2017/09/arc-of-justice-indie-film-loses-chinese-wanda-financing-hawk-koch-mark-gordon-1202169934/
[82] *Wanda Pictures Invites Mr. Hawk Koch, Former President of the Oscars to Conduct Business Trainings,* WANDA GROUP (Jul.6, 2017), https://www.wanda-group.com/2017/latest_0607/1672.html.

Defendant Locke has served as a Company director since February 2016 and is a member of the Nominating and Corporate Governance Committee. Defendant Locke is, as the Company admits, a non-independent director. He received lavish compensation, including $145,725 in 2016. As a member of the Nominating and Corporate Governance Committee, Defendant Locke is responsible for reviewing, on an annual basis, the appropriate criteria that directors are required to fulfill (including experience, qualifications, attributes, skills and other characteristics) in the context of the current make-up of the Board and the needs of the Board given the circumstances of the Company. Thus, Defendant Locke is required to be familiar with the unique circumstances of the Company in order to serve his role on the Nominating and Corporate Governance Committee. Because the subject of the misleading statements and omissions pertained to material events going to the core operations of the Company, and because he approved and had to have to done due diligence on the acquisitions of Carmike, Odeon, and Nordic, given his role, Defendant Locke must have been aware of the falsity of the statements and omissions alleged above at the time they were made. Moreover, Defendant Locke received lavish compensation, including $145,725 in 2016. As a trusted Company director and member of the Nominating and Corporate Governance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and omissions, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Locke is a defendant in the Securities Class Action. Further, Defendant Locke has demonstrated a penchant for using positions of trust for personal gain. During his tenure as U.S. Ambassador to China, he sold his home to a wealthy Chinese businesswoman, later taking a paid position with her husband's real

estate firm, APIC, after stepping down from his ambassadorship.[83] Three months after the sale, the businesswoman's brother was invited to attend an exclusive meeting convened by Locke to discuss real estate investment opportunities with other developers far larger than APIC.[84] He has also been involved in multiple campaign finance violations. In 1997, Defendant Locke was assessed the maximum fine for a campaign finance violation for failing to disclose the names of two cash donors – one of whom was considered to be the then-leader of the Ghost Shadows gang (which is involved in a variety of criminal activities between New York and China) and a second whose restaurant was sued for stealing tips from waiters to the tune of $1 million.[85] He was also involved in the "Chinagate" campaign finance scandal, which involved foreign nationals pouring money into U.S. politics and ultimately led the DNC to return $1.6 million in funds raised by DNC staffer John Huang—although Defendant Locke retained all of the donations connected to the scandal other than a $750 donation from Huang himself.[86] Thus, for these reasons, Defendant Locke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

247.    Additional reasons that demand on Defendant Zeng is futile follow. Defendant Zeng is responsible for the false and misleading statements and omissions made in the Registration Statement and 2016 10-K, which he signed. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Defendant Zeng has served as a Company director since February 2016 and as non-executive Chairman since March 14, 2018. Defendant Zeng is president of Wanda Cinema Line Co, Ltd., a subsidiary of Wanda, and is thus,

---

[83]   Drew Atkins, *The scandals of former Gov. Gary Locke*, CROSSCUT. (Aug. 11, 2016), https://crosscut.com/2016/08/the-scandals-of-former-gov-gary-locke.
[84]   Lee Fang and Jon Schwartz, *A "Desperate" Seller*, THE INTERCEPT (Aug. 3, 2016), https://theintercept.com/2016/08/03/gary-locke-ambassador-to-china-house-sale-chinese-tycoon/
[85]   Drew Atkins, *The scandals of former Gov. Gary Locke*, CROSSCUT. (Aug. 11, 2016), https://crosscut.com/2016/08/the-scandals-of-former-gov-gary-locke
[86]   *Id.*

as the Company admits, a non-independent director. As non-executive Chairman, Defendant Zeng is responsible for overseeing board matters and assisting the CEO with strategic initiatives. Thus, Defendant Zeng is required to be familiar with the core operations and strategic initiatives of the Company (including strategic acquisitions) in order to serve his role as non-executive chairman. Because the subject of the misleading statements and omissions pertained to material events going to the core operations and strategic initiatives of the Company, and because he approved and had to have to done due diligence on the acquisitions of Carmike, Odeon, and Nordic, given his role, particularly with respect to strategic acquisitions, Defendant Zeng must have been aware of the falsity of the statements and omissions alleged above at the time they were made. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and omissions, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Zeng is a defendant in the Securities Class Action. Thus, for these reasons, Defendant Zeng breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

248.    Additional reasons that demand on Defendant Pawlus is futile follow. Defendant Pawlus is responsible for the false and misleading statements and omissions made in the Registration Statement and 2016 10-K, which she signed. She also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Defendant Pawlus has served as a Company director since December 2014 and is Chair of the Audit Committee. She received lavish compensation, including $162,704 in 2016. As Chair of the Audit Committee, Defendant Pawlus is responsible for overseeing AMC's financial reporting

process and internal control system, overseeing the performance of AMC's internal audit function, and overseeing AMC's compliance with legal, ethical and regulatory matters. Thus, given her role, Defendant Pawlus is required to be familiar with the core operations of the Company in order to serve her role on the Audit Committee, and given that she approved and had to have to done due diligence on the acquisitions of Carmike, Odeon, and Nordic, she must have been aware of the falsity of the statements and omissions alleged above at the time they were made, particularly where they related directly to financial statements that the Audit Committee was responsible for overseeing. As a director and Chair of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and omissions, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Pawlus is a defendant in the Securities Class Action. Thus, for these reasons, Defendant Pawlus breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

249.    Additional reasons that demand on Defendant Hill is futile follow. Defendant Hill is responsible for the false and misleading statements and omissions made in the Registration Statement and 2016 10-K, which he signed. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Defendant Hill has served as a company director since December 2013 and sits on the Audit Committee. He received lavish compensation, including $168,704 in 2016. As a member of the Audit Committee, Defendant Hill is responsible for overseeing AMC's financial reporting process and internal control system, overseeing the performance of AMC's internal audit function, and overseeing AMC's compliance with legal, ethical and regulatory matters. Because Defendant Hill is required to be familiar with

the core operations of the Company in order to serve his role on the Audit Committee, and because he approved and had to have to done due diligence on the acquisitions of Carmike, Odeon, and Nordic, given his role, he must have been aware of the falsity of the statements and omissions alleged above at the time they were made, particularly where they related directly to financial statements that the Audit Committee was responsible for overseeing. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and omissions, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Hill is a defendant in the Securities Class Action. Thus, for these reasons, Defendant Hill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250.    Additional reasons that demand on Defendant Saich is futile follow. Defendant Saich is responsible for the false and misleading statements and omissions made in the Registration Statement and 2016 10-K, which he signed. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Defendant Saich has served as a Company director since August 2012, and is Chair of the Nominating and Corporate Governance Committee, and is a member of the Audit Committee. As Chair of the Nominating and Corporate Governance Committee, Defendant Saich is responsible for reviewing, on an annual basis, the appropriate criteria that directors are required to fulfill (including experience, qualifications, attributes, skills and other characteristics) in the context of the current make-up of the Board and the needs of the Board given the circumstances of the Company. As a member of the Audit Committee, Defendant Hill is responsible for overseeing AMC's financial reporting

process and internal control system, overseeing the performance of AMC's internal audit function, and overseeing AMC's compliance with legal, ethical and regulatory matters. Thus, Defendant Saich is required to be familiar with the unique circumstances and core operations of the Company in order to serve his role on the Nominating and Corporate Governance Committee and Audit Committee. Because the subject of the misleading statements and omissions pertained to material events going to the core operations of the Company, and because he approved and had to have to done due diligence on the acquisitions of Carmike, Odeon, and Nordic, given his role, Defendant Saich must have been aware of the falsity of the statements and omissions alleged above at the time they were made, particularly where they related directly to financial statements that the Audit Committee was responsible for overseeing. Moreover, he received lavish compensation, including $163,704 in 2016. As a trusted Company director and member of the Audit Committee and the Nominating and Corporate Governance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and omissions, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Saich is a defendant in the Securities Class Action. Thus, for these reasons, Defendant Saich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251.   Additional reasons that demand on the Board is futile follow.

252.   Wanda breached its fiduciary duties to AMC as controlling shareholding because it caused AMC to engage in the violations of the securities laws alleged herein. Wanda was motivated to commit the fraud because the misleading statements and omissions described above artificially increased the value of AMC's shares, generated additional revenue from the SPO,

which benefited Wanda in proportion of its stake in AMC. The SPO further facilitated the acquisitions described herein in which Wanda was interested. Thus, Wanda is interested in the subject matter of the instant action.

253.    The Individual Defendants, in turn, are beholden to Wanda because they depend on their positions at AMC, positions at subsidiaries of Wanda, and/or business relationships with Wands for their livelihood. Specifically, the Director-Defendants have longstanding business and personal relationships with each other, Wanda, and the Individual Defendants that preclude them from acting independently of Wanda and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question Wanda's and the Individual Defendants' conduct. Thus, because the Director-Defendants cannot evaluate a demand with independence, demand upon the Director-Defendants would be futile.

254.    For example, Directors Zeng and Aron, like former director Zhang, have close business associations with Wanda, in that they rely on Wanda subsidiaries for their livelihood. Further, as alleged above, Director Koch also maintains close business associations with Wang Jianlin, Wanda's founder. Wanda was highly interested in the acquisitions discussed above and has been acquiring media assets outside of China for some time, including Legendary Entertainment for $3.5 billion. According to the 2017 Proxy Statement, Wanda "agreed to make a capital contribution of $10,000,000 to AMC (without any increase in Wanda's economic interest or voting rights in the Company) for payment to certain officers, directors, and other personnel for extraordinary services rendered in connection with merger and acquisition activity in 2016." This support came despite denials from AMC that any funding from Wanda was used to complete any of the acquisitions. These facts support the inference that Wanda's motivations in pursuing the

acquisitions noted above were not purely economic and in the best interest of investors, but instead animated by a desire to influence and control the messages advanced in the entertainment experiences exhibited at AMC's theatres. As stated by former lobbyist Richard Berman in response to the DOJ's approval of the merger of Carmike and AMC:

> The Department of Justice decision will surely be celebrated by China's Communist elites, who have close ties to Dalian Wanda and are more interested in on-screen messages than selling popcorn, candy, and drinks . . . The approved AMC-Carmike merger is a blatant attempt by Wang Jianlin and his government investors to control U.S. public opinion through movie production and distribution pressures, despite his claims to the contrary. The failure of the anti-trust review to acknowledge these pressures is predictable. Hopefully, more targeted national security concerns by the Obama administration will trigger a supplemental review from the Committee on Foreign Investment in the United States (CFIUS).

These motives have caused Wanda to benefit from the acquisitions in a way that other shareholders have not, have and created a lack of alignment between Wanda's incentives and those of other shareholders. As a result of their close business associations with Wanda, which pushed the acquisitions described herein giving rise to the misleading statements and omissions at issue, Directors Zeng, Aron and Koch are beholden to Wanda, and therefore, demand as to them is excused.

255.    Directors Saich, Hill, Koch, and Pawlus all sat on the board on April 10, 2015, the date on which AMC notified Carmike that it was no longer interested in pursuing the merger initially proposed in 2014.  That is confirmed in the Carmike Merger Proxy, indicating that "over time [AMC's] management ***and board*** grew increasingly less comfortable with the terms of the transaction."[87] As evidenced by the confidential witness statements noted above, the merger was abandoned in 2015 due to unexpected issues and weaknesses in Carmike's business due to a protracted period of underinvestment at Carmike uncovered during due diligence. Thus, Directors

---

[87] Emphasis added.

Saich, Hill, Koch, and Pawlus were aware of the revenue weaknesses and protracted failures to invest in theater upkeep at Carmike both when the merger was consummated and subsequently when the false and misleading statements and omissions were made, thus face a substantial likelihood of liability, are not disinterested, and demand as to them is excused.

256.    All of the Director-Defendants have demonstrated their unwillingness to consider a demand relating to the wrongdoing alleged herein. As reported in the Company's Form 10-Q for the quarter ended June 30, 2017, filed with the SEC on August 7, 2018, a shareholder demand for the inspection of "books and records pursuant to 8 *Del. C.* § 220 in order to investigate allegations substantially similar to those alleged in the [Securities Class Action]," received by AMC on June 25, 2018, was rejected on July 2, 2018, a mere seven days after its receipt.

257.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in Wanda's and the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise Wanda's and the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

258.    AMC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

AMC any part of the damages AMC suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

259.    Wanda's and the Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

260.    The acts complained of herein constitute violations of fiduciary duties owed by AMC's officers and directors (along with Wanda), and these acts are incapable of ratification.

261.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AMC. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of AMC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

262.    If there is no directors' and officers' liability insurance, then the Directors will not cause AMC to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

263.    Thus, for all of the reasons set forth above, all seven of the Director-Defendants cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

264.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

266.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

267.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

268.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) Carmike had been experiencing a prolonged period of financial underperformance largely due to a protracted period of underinvestment in its theaters; (2) following the Carmike acquisition, AMC was able to retain only a very small number of Carmike's loyalty program members; (3) the issues identified in (1)-(2) above were then having a material adverse effect on Carmike's operations and theater attendance and, as a result, AMC planned to boost attendance at Carmike theaters by materially expanding promotional and capital investment spending activity, expenditures which were reasonably likely to have a material adverse effect on AMC's near term operating results; (4) attendance at AMC's European theaters was slower during the summer season than during the rest of the year; (5) representations concerning Carmike's operations, the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and/or misleading; (6) AMC failed to maintain adequate internal controls; and (7) as a result of the foregoing, the Company lacked a reasonable basis for its positive statements about AMC's then-current business and future financial prospects, including statements relating to AMC's financial guidance, and cost synergies associated with the "flawless" Carmike integration.

269.    The 2017 Proxy Statement failed to disclose as required material adverse trends likely to affect the Company's revenue or income from continuing operations, including, but not limited to, the fact that legacy Carmike theaters were suffering from a protracted period of underinvestment, resulting in significant costs to AMC in transitioning those theaters, and that AMC was only able to transition a small number of Carmike's loyalty program members to its own loyalty program.

270.    Moreover, the 2017 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

271.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including election of directors, advisory approval of executive compensation, and appointment of an independent auditor.

272.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Saich, Locke, and Pawlus, which allowed them to continue breaching their fiduciary duties to AMC.

273.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

274.    Plaintiff on behalf of AMC has no adequate remedy at law.

## SECOND CLAIM

**Against Wanda and the Individual Defendants for Breach of Fiduciary Duties**

275.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

276.    Wanda and each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AMC's business and affairs.

277.    Wanda and each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

278.    Wanda's and the Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants and Wanda intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AMC.

279.    In breach of their fiduciary duties owed to AMC, Wanda and the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose that: (1) Carmike had been experiencing a prolonged period of financial underperformance largely due to a protracted period of underinvestment in its theaters; (2) following the Carmike acquisition, AMC was able to retain only a very small number of Carmike's loyalty program members; (3) the issues identified in (1)-(2) above were then having a material adverse effect on Carmike's operations and theater attendance and, as a result, AMC planned to boost attendance at Carmike theaters by materially expanding promotional and capital investment spending activity, expenditures which were reasonably likely to have a material adverse effect on AMC's near term operating results; (4) attendance at AMC's European theaters was slower during the summer season than during the rest of the year; (5) representations concerning Carmike's

operations, the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and/or misleading; (6) AMC failed to maintain adequate internal controls; and (7) as a result of the foregoing, the Company lacked a reasonable basis for its positive statements about AMC's then-current business and future financial prospects, including statements relating to AMC's financial guidance, and cost synergies associated with the "flawless" Carmike integration.

280.    Wanda and the Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

281.    Also in breach of their fiduciary duties, Wanda and the Individual Defendants failed to maintain internal controls.

282.    Wanda and the Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. Wanda and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AMC's securities.

283.    Wanda and the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. Wanda and the Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal

controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AMC's securities.

284.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

285.    As a direct and proximate result of Wanda and the Individual Defendants' breaches of their fiduciary obligations, AMC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Wanda and the Individual Defendants are liable to the Company.

286.    Plaintiff on behalf of AMC has no adequate remedy at law.

## THIRD CLAIM

**Against Wanda and the Individual Defendants for Unjust Enrichment**

287.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

288.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, Wanda and the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AMC.

289.    Wanda and the Individual Defendants either benefitted financially from the improper conduct or received profits (including from the SPO), bonuses, stock options, or similar compensation from AMC that was tied to the performance or artificially inflated valuation of AMC, or received compensation that was unjust in light of Wanda's and the Individual Defendants' bad faith conduct.

290.    Plaintiff, as a shareholder and a representative of AMC, seeks restitution from Wanda and the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Wanda and the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

291.    Plaintiff on behalf of AMC has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against Wanda and all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of AMC, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that Wanda and the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to AMC;

(c)    Determining and awarding to AMC the damages sustained by it as a result of the violations set forth above from Wanda and each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing AMC and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AMC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the board;

2. a provision to permit the shareholders of AMC to nominate at least four candidates for election to the Board;

3. a provision to declassify the Board; and

4. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding AMC restitution from Wanda and Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: October 2, 2019                    Respectfully submitted,

                                          **THE ROSEN LAW FIRM, P.A.**


                                          */s/ Phillip Kim*
                                          Phillip Kim
                                          275 Madison Avenue, 40th Floor
                                          New York, NY 10016
                                          Telephone: (212) 686-1060
                                          Facsimile: (212) 202-3827
                                          Email: pkim@rosenlegal.com

                                          *Counsel for Plaintiff*

## **VERIFICATION**

I, Jennifer Kenna am a plaintiff in the within action. I have reviewed the allegations made in this consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2019.

9/24/2019

Jennifer Kenna

Jennifer Kenna